Robert Galvin (SBN 171508)
 robert.galvin@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile:  (650) 858-6100

William F. Lee
 william.lee@wilmerhale.com
Cynthia D. Vreeland
 cynthia.vreeland@wilmerhale.com
Peter Dichiara
 peter.dichiara@wilmerhale.com
Marissa A. Lalli
 marissa.lalli@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
60 State Street
Boston, MA  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

*Attorneys for Defendants and Counterclaim-Plaintiffs EMC Corporation and VMware, Inc.*

**REDACTED VERSION
OF DOCUMENT SOUGHT
TO BE SEALED**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC and LEVEL 3 COMMUNICATIONS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> EMC CORPORATION and VMWARE, INC., <br><br> Defendants. | CASE NO.:  5:13-cv-01358-EJD <br><br> **DEFENDANTS' MOTION FOR ATTORNEY FEES UNDER 35 U.S.C. § 285** <br><br> Date: May 21, 2020 <br> Time: 9:00 AM <br> Before: Hon. Edward J. Davila <br> Courtroom: 4, 5th Floor |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 2

II.     FACTUAL BACKGROUND ............................................................................... 4

        A.      PersonalWeb Was Created to Weaponize the True Name Patents. ........................ 4

                1.      Brilliant Created PersonalWeb to Target Cloud-Computing
                        Companies. ................................................................................................. 4

                2.      PersonalWeb Attempted to Conceal Its True Purpose
                        While Preparing for Litigation. ................................................................. 5

        B.      PersonalWeb Relentlessly Pursued Its Unreasonable Claims
                Against Defendants. ................................................................................................ 8

                1.      PersonalWeb's Litigation Tactics Forced Defendants
                        to Incur Needless Costs. ............................................................................ 8

                2.      The PTAB and Federal Circuit Found All of the True Name Patents
                        Challenged by EMC and VMware Invalid. ............................................. 10

        C.      PersonalWeb Continued Its Litigation Against EMC and VMware
                Even After the IPRs. ............................................................................................. 12

        D.      PersonalWeb Continued to Expand Its Litigation Campaign Exponentially,
                Even as the IPRs Revealed the Fundamental Flaws in the True Name Patents. .... 14

        E.      PersonalWeb Was on Notice of the Fundamental Weaknesses in its Case .......... 15

III.    ARGUMENT ..................................................................................................... 16

        A.      PersonalWeb Asserted its Patents in an Unreasonable Manner,
                Using Improper Litigation Tactics ...................................................................... 17

        B.      PersonalWeb Pressed Its Claims Despite Clear Notice that
                They Were Exceptionally Weak on the Merits ..................................................... 19

        C.      Defendants' Requested Fees, Including for IPR Proceedings, Are Reasonable ... 22

IV.     CONCLUSION .................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Akamai Techs., Inc. et al. v. Digital Island, Inc. et al.*,
No. 1:00-cv-11851-RWZ (D. Mass.) ................................................................. 4

*Altnet Inc. et al. v. RIAA et al.*,
No. 2:04-cv-07456-JFW-CT (C.D. Cal.) ............................................................. 5

*Altnet Inc. et al. v. Streamcast Networks Inc., et al.*,
No. 2:06-cv-05086-ODW-E (C.D. Cal.) .............................................................. 5

*Cable & Wireless Internet Servs., Inc. et al. v. Akamai Techs., Inc.*,
No. 1:02-cv-11430-RWZ (D. Mass.) ................................................................. 4

*Commil USA LLC v. Cisco Sys., Inc.*,
135 S. Ct. 1920 (2015) ................................................................................ 22, 23

*DCG Sys., Inc. v. Checkpoint Techs., LLC*,
No. C–11–03792 PSG, 2011 WL 5244356 (N.D. Cal. Nov. 2, 2011) ................................... 23

*Deep Sky Software, Inc. v. Southwest Airlines Co.*,
No. 10-cv-1234-CAB (KSC), 2015 WL 10844231 (S.D. Cal. Aug. 19, 2015) ...................... 23

*Kinetech, Inc. et al. v. The Lime Group, Inc. et al.*,
No. 2:07-cv-06161-VBF-PLA (C.D. Cal.) ........................................................... 5

*Large Audience Display Systems, LLC v. Tennman Productions, LLC*,
745 Fed. App'x 153 (Fed. Cir. 2018) ................................................................ 19

*Logic Devices, Inc. v. Apple Inc.*,
No. 13-cv-2943-WHA, 2014 WL 6844821 (N.D. Cal. Dec. 4, 2014) ........................... 16, 21

*MGM Studios, Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ...................................................................................... 5

*Monolithic Power Sys. Inc. v. O2 Micro Int'l Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013) ........................................................................ 18

*Munchkin, Inc. v. Luv N'Care, Ltd.*,
No. CV 13-06787 JEM, 2018 WL 7504404 (C.D. Cal. Dec. 27, 2018) ....................... *passim*

*My Health, Inc. v. ALR Techs., Inc.*,
No. 2:16-cv-00535-RWS-RSP, 2017 WL 6512221 (E.D. Tex. Dec. 19, 2017) .... 19, 21-22, 23

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
134 S. Ct. 1749 (2014) ..................................................................... 4, 16, 17, 22

*In re PersonalWeb Techs., LLC, & Level 3 Commc'ns, LLC, Patent Litig.*,
MDL No. 2834, 340 F. Supp. 3d 1373 (J.P.M.L. 2018) ................................... 15, 18

*PersonalWeb Techs. LLC et al. v. Apple Inc.*,
    C.A. 6:12-cv-00660 (E.D. Tex.)................................................................................ 15

*PersonalWeb Techs. LLC et al. v. Facebook Inc.*,
    C.A. 6:12-cv-00662 (E.D. Tex.)................................................................................ 15

*PersonalWeb Techs. LLC et al. v. Int'l Business Machines Corp.*,
    C.A. 6:12-cv-00661 (E.D. Tex.)................................................................................ 15

*PersonalWeb Techs. LLC et al. v. Microsoft Corp.*,
    C.A. 6:12-cv-00663 (E.D. Tex.) ............................................................................... 15

*PersonalWeb Techs. LLC et al. v. Nexsan Techs. Inc.*,
    C.A. 6:12-cv-00657 (E.D. Tex.)................................................................................ 15

*PersonalWeb Techs. LLC et al. v. Rackspace US Inc. et al.*,
    C.A. 6:12-cv-00659 (E.D. Tex.)................................................................................ 15

*PersonalWeb Techs. LLC et al. v. Yahoo Inc.*,
    C.A. 6:12-cv-00658 (E.D. Tex.)................................................................................ 15

*PersonalWeb Techs., LLC v. Apple, Inc.*,
    917 F.3d 1376 (Fed. Cir. 2019)................................................................................ 12

*PPG Indus., Inc. v. Celanese Polymer Specialties Co.*,
    840 F.2d 1565 (Fed. Cir. 1988)...........................................................................22-23

*ReedHycalog UK, Ltd. v. Diamond Innovations Inc.*,
    No. 6:08–CV–325, 2010 WL 3238312 (E.D. Tex. Aug. 12, 2010) ...................18-19

*Yufa v. TSI Inc.*,
    No. 09-cv-1315-KAW, 2014 WL 4071902 (N.D. Cal. Aug. 14, 2014)................. 16

**Federal Statutes**

35 U.S.C. § 101 .................................................................................................*passim*

35 U.S.C. § 102 ............................................................................................... 10, 20

35 U.S.C. § 103 ............................................................................................... 10, 20

35 U.S.C. § 285 .................................................................................................*passim*

35 U.S.C. § 314 ....................................................................................................... 10

35 U.S.C. § 316 ....................................................................................................... 11

**Federal Regulations**

37 C.F.R. § 42.1 ..................................................................................................... 11

### NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE that on May 21, 2020, at 9:00 a.m. in Courtroom 4 of this Court located at 280 South 1st Street, San Jose, CA 95113, Defendants EMC Corporation and VMware, Inc. (collectively, "Defendants") shall and hereby do move the Court for an order awarding attorneys' fees pursuant to 35 U.S.C. § 285. This Motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Marissa A. Lalli, and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.  Plaintiffs PersonalWeb Technologies, LLC and Level 3 Communications, LLC (collectively, "Plaintiffs" or "PersonalWeb") oppose this motion.

### STATEMENT OF RELIEF REQUESTED

Pursuant to 35 U.S.C. § 285, Defendants move the Court for an order requiring Plaintiffs PersonalWeb Technologies, LLC and Level 3 Communications, LLC (collectively, "Plaintiffs" or "PersonalWeb") to compensate Defendants EMC Corporation and VMware, Inc. (collectively, "Defendants") for a reasonable portion of Defendants' attorney fees (the specific amount to be determined following briefing on that issue).

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.     INTRODUCTION**

3       From the beginning, this litigation was based on a series of fictions and should never have

4  been brought.  For example:

5     - Plaintiff PersonalWeb Technologies LLC ("PersonalWeb") is a shell company, created
        in Tyler, Texas to pursue litigation in the Eastern District of Texas.  The patents were
6       transferred to PersonalWeb only after the prior owner announced its intention to file this
        lawsuit.
7

8     - PersonalWeb created a fictional product, called StudyPods, solely "to ensure a bigger
        award in an infringement action."  Ex. A[1] at 3 (Order Granting in Part Defs.' Mot. for
9       Sanctions, *PersonalWeb Techs. LLC v. Google, Inc.*, No. 5:13-cv-01317, ECF No. 267
        (N.D. Cal. Feb. 13, 2014)).
10

11    - PersonalWeb systematically deleted relevant emails it was under a duty to preserve, prior
        to and in anticipation of the litigation, leading to sanctions against PersonalWeb in
12      related litigation against Google.

13    - PersonalWeb sued Defendants in the Eastern District of Texas, despite the lack of any
        material connection between this dispute and Texas—and ***after*** PersonalWeb's parent
14      company claimed in prior litigation that litigating the patents anywhere other than
        California would impose "substantial hardship and burden"—forcing Defendants to
15      engage in expensive transfer proceedings.  Def.'s Mot. to Transfer Venue at 6 (E.D. Tex.
        ECF No. 13).[2]
16

17       In short, PersonalWeb initiated this case as a sham and has litigated it throughout in an effort

18  to needlessly drive up litigation costs and to attempt to force dozens of companies into unwarranted

19  settlements.

20       Although PersonalWeb has held itself out to the public as a Texas-based innovator that was

21  developing a commercial educational tool, called "StudyPods," it was in fact a puppet of its

22  California-based parent, Brilliant Digital Entertainment ("Brilliant"), and the product was pure

23  fiction.  PersonalWeb's actual business was—and still remains—the assertion of what it has dubbed

24  the "True Name" patents against successful cloud-computing companies, such as EMC and

25

26  [1] All citations to "Ex. __" are to the Declaration of Marissa A. Lalli, filed herewith.

27  [2] References to "E.D. Tex. ECF No. __" are to the docket in *PersonalWeb Techs., LLC v. EMC
    Corp.*, No. 6:11-cv-660-LED (E.D. Tex.), reflecting activity in this case prior to its transfer to this
28  Court.

1   VMware ("Defendants"), in the hopes of a quick payday.  In fact, in the eight years since filing its

2   complaint against the Defendants—and while the Patent Trial and Appeal Board ("PTAB") and

3   courts have invalidated claim after claim of the True Name patents—PersonalWeb has been

4   expanding its litigation campaign to more than fifty defendants in five different venues, with the

5   transparent goal of strong-arming settlements out of each one.

6       PersonalWeb's tactics were designed to mask the fundamental substantive flaws in the

7   patents—flaws repeatedly confirmed over the course of this case.  The inventors of the asserted

8   "True Name" patents made the bold claim—in the opening paragraphs of their patent

9   specification—that they were first to design a data-processing system that identified data items

10  based not on each file's context or location in a file system, but instead based on each data item's

11  content (using so-called "content-based" identifiers).  *See, e.g.*, U.S. Patent No. 7,802,310 (the "'310

12  patent") at 2:26-40 ("In prior art systems for identifying data items there is ***no*** direct relationship

13  between the data names and the data item." (emphasis added)).  This bold claim was plainly wrong.

14  As EMC and VMware highlighted in their 2012 invalidity contentions, what the True Name patents

15  claimed as the fundamental premise of their invention—identifiers based on the content of the data

16  items—were already well-understood, fully disclosed, and in use long before the patents' priority

17  date.  As such, the PTAB invalidated all challenged and asserted claims of all six IPR petitions filed

18  by EMC and VMware, and the Federal Circuit affirmed.  In fact, as EMC explained to PersonalWeb

19  after the PTAB issued its decisions, "the PTAB rejected the claims based on multiple grounds and

20  multiple references, confirming that the claims' validity was not a close call."  Ex. B at 1 (Letter

21  from EMC to Hadley (May 21, 2014)).  After PersonalWeb voluntarily dropped, with prejudice, a

22  seventh asserted patent, the Court likewise invalidated the eighth and final patent for failing to meet

23  the patentability standard under 35 U.S.C. § 101 ("Section 101"), noting PersonalWeb's position

24  amounted to a significant overreach that would "allow Plaintiff to monopolize the entire field of

25  data storage."  Am. Order Granting Defs.' Mot. for J. on the Pleadings at 24 (ECF No. 84).  No such

26  monopoly was warranted.

27      As result of PersonalWeb's conduct, EMC and VMware have each had to bear significant

28  attorneys' fees and costs necessary to defend against PersonalWeb's meritless claims.  Accordingly,

---

**DEFENDANTS' MOTION FOR ATTORNEY FEES UNDER 35 U.S.C. § 285**
CASE NO.:  5:13-CV-01358-EJD                                                                                     3

this case presents precisely the kind of "exceptional" circumstances that warrant an award of attorneys' fees under 35 U.S.C. § 285.  As the Supreme Court made clear in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, "an 'exceptional' case is simply one that stands out from others with respect to (1) the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or (2) the unreasonable manner in which the case was litigated."  134 S. Ct. 1749, 1755-56 (2014).  This case "stands out" and qualifies as "exceptional" on both grounds.

Because this case was ill-founded from the outset, the Court should order the recovery of all of Defendants EMC's and VMware's attorneys' fees from the inception of the lawsuit to the present, including the related IPR and appellate proceedings.  Imposing such fees on PersonalWeb for its vexatious conduct is the fair and just result.  At a minimum, the Court should award fees beginning after December 14, 2012, when Defendants served their invalidity contentions exposing the fatal flaws in PersonalWeb's patents.  *See* Ex. C (Defs. EMC Corp.'s and VMware, Inc.'s Invalidity Contentions, 6:11-cv-660 (E.D. Tex. Dec. 14, 2012)).

## II.  FACTUAL BACKGROUND

### A.  PersonalWeb Was Created to Weaponize the True Name Patents.

#### 1.  Brilliant Created PersonalWeb to Target Cloud-Computing Companies.

PersonalWeb's parent company, Brilliant, and Brilliant's subsidiaries, Altnet and Kinetech, have controlled the "True Name" patent family asserted in this case for nearly two decades.  During that time, Brilliant has wielded the patents against a series of different industries, using these broad—and plainly invalid—patents as weapons in the courtroom to extract as many litigation settlements as possible.[3]

---

[3] Even before Brilliant acquired its initial interest in the patents in 2002, the prior owners used the now-invalidated True Name patents to extract settlements.  For example, Digital Island, a content-delivery company with a 50% stake in the first two True name patents, sued its competitor Akamai in District of Massachusetts.  The first case resulted in a finding of no infringement and the second case settled.  *See Akamai Techs., Inc. et al. v. Digital Island, Inc. et al.*, No. 1:00-cv-11851-RWZ (D. Mass.); *Cable & Wireless Internet Servs., Inc. et al. v. Akamai Techs., Inc.*, No. 1:02-cv-11430-RWZ (D. Mass.).

---

Brilliant acquired its initial interest in the True Name patent family in 2002, for the purpose of asserting them against its business rivals in the music file-swapping business.[4]  After the Supreme Court's decision in *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), heralded the end of the music file-swapping business, Brilliant focused its attention on a new set of litigation targets. On July 6, 2011, Brilliant and Kinetech issued a press release announcing the issuance of three more True Name patents and their intention to enforce the entire portfolio against the storage and cloud-computing industries.  *See* Ex. E (July 6, 2011 press release).  In the following months, in a transparent attempt to manufacture a connection to Texas where there was none, these California-based companies transferred the True Name patents to a recently formed, Texas-based subsidiary: PersonalWeb Technologies LLC.[5]  *See* Ex. F (Sept. 28, 2011 press release); Ex. G (July 5, 2011 assignment of patents from Kinetech to PersonalWeb).  On December 6, 2011, PersonalWeb issued a press release describing itself as a "Tyler, Texas-based technology company," collaborating with the University of Texas at Tyler on its "StudyPods" product.  *See* Ex. H (Dec. 6, 2011 press release). Two days later, PersonalWeb filed its first set of lawsuits against nine cloud computing companies—including the instant case against EMC and VMware.

### 2. PersonalWeb Attempted to Conceal Its True Purpose While Preparing for Litigation.

PersonalWeb claimed in its Complaint to be an operating business focused on the development of software products and systems for consumer, educational, and content-distribution

---

[4] Brilliant was at the time promoting a music file-swapping network called KaZaA and asserted the earliest True Name patents against its business competitors—such as StreamCast and LimeWire, as well as the Recording Industry Association of America ("RIAA")—and successfully extracted settlements from each defendant.  *See Altnet Inc. et al. v. RIAA et al.*, No. 2:04-cv-07456-JFW-CT (C.D. Cal.); *Altnet Inc. et al. v. Streamcast Networks Inc., et al.*, No. 2:06-cv-05086-ODW-E (C.D. Cal.); *Kinetech, Inc. et al. v. The Lime Group, Inc. et al.*, No. 2:07-cv-06161-VBF-PLA (C.D. Cal.). Altnet, Brilliant, and Kinetech's litigation against the RIAA appears to have been in retaliation for litigation against KaZaA and related entities based on the substantial volume of copyright infringement occurring on those platforms in the early 2000s.  *See, e.g.*, Ex. D, John Borland, *Altnet to Pay Kazaa Users for Swapping*, CNET (June 2, 2003, 5:58 AM PDT), https://www.cnet.com/news/altnet-to-pay-kazaa-users-for-swapping/.

[5] Brilliant stayed on as majority owner in PersonalWeb.

---

markets.  *See* Compl. ¶¶ 10-12 (E.D. Tex. ECF No. 1).  In fact, it was not.  PersonalWeb's only

discernible activity has been its initiation of dozens of infringement lawsuits.  *See* Ex. I

(PersonalWeb's "Litigation History" webpage).

   In an effort to obscure its real purpose, the company went on a hiring spree in 2010.  It hired

a Director of Technology affiliated with the University of Texas at Tyler and the City of Tyler,

along with a group of college students, and it created a website that listed biographies for each of its

twelve employees.  *See* Ex. J (archived copy of PersonalWeb's "About" page from Feb. 2012).

PersonalWeb represented that its student hires were developing a product called "StudyPods,"

which was purportedly an "educational social networking product" for university and college

markets based on PersonalWeb's patented technology.  *See* Ex. H (Dec. 6, 2011 press release); *see*

*also* Ex. F (Sept. 28, 2011 press release); Ex. K (archived copy of PersonalWeb's "Products" page

from Feb. 2012).

   But PersonalWeb's website, its employees, and its product goals were all a facade.  For

example, ███████████████████████████████████████.  *See* Ex. L at

542:4-6 (Weiss Dep. Tr. Vol. II).  ██████████████████████████████████

█████████████.  *See id.* at 563:8-17 ████████████████████████

████████████████████████████████████████████████████; *id.*

at 565:1-23 ███████████████████████████████████████████████;

*see also id.* at 583:9-584:24, 598:23-599:19, 601:24-602:18, 605:21-25, 628:9-19.  And, in fact, in

its order issuing sanctions, the Court noted that Jacob Drew, a former PersonalWeb employee,

testified that he and other employees were "specifically instructed to incorporate the [True Name]

patents [in the StudyPod products] to ensure a bigger award in an infringement action."  Ex. A at 3

(Order Granting in Part Defs.' Mot. for Sanctions); *see also* █████████████████.

   PersonalWeb's real intentions became clear when PersonalWeb's CEO, Michael Weiss,

instructed employees to purge all unnecessary emails before litigation began.  Ex. A at 5 (Order

Granting in Part Defs.' Mot. for Sanctions).  At least as early as May 2011, Weiss informed

PersonalWeb employees that PersonalWeb was planning lawsuits.  *Id.* at 2 (noting testimony of Mr.

Drew that "as early as May 2011, Weiss had repeatedly told employees at weekly lunch meetings

1   that PersonalWeb planned on filing lawsuits against major technology companies"); *see also* ███

2   ███████████████████.  By July 6, 2011, Kinetech—which had transferred several True Name

3   patents to PersonalWeb the previous day—publicly announced its plans to "actively pursue

4   licensing" of those patents.[6]  Ex. E (July 6, 2011 press release); *see also* Ex. G (July 5, 2011

5   assignment of patents from Kinetech to PersonalWeb).  In August 2011, in the midst of

6   PersonalWeb's acquisition of the complete True Name portfolio, PersonalWeb implemented a new

7   email retention policy, which required employees to delete emails with "transitory value."  Ex. A at

8   2 (Order Granting in Part Defs.' Mot. for Sanctions).  On October 5, 2011, Mr. Weiss again

9   reminded the employees of the retention policy—and as Mr. Drew testified, Mr. Weiss issued a

10  "purge order" around that time because "he did not want massive amounts of email to go in through

11  discovery."  *Id.* at 2-3.  According to Mr. Drew's testimony, this directive came ***several months***

12  ***after*** Mr. Weiss began openly discussing the plan to file lawsuits against major companies, only ***a***

13  ***few weeks after*** PersonalWeb acquired the True Name patents from Brilliant and its subsidiaries,

14  and ***a mere two months before*** PersonalWeb filed the complaint in this case.[7]  *Id.* at 4 (emphasis

15  added).

16          As a result of PersonalWeb's misconduct, the Court issued monetary sanctions against

17  PersonalWeb in a related case brought by the plaintiff against Google.  Ex. A at 7-8 (Order Granting

18  in Part Defs.' Mot. for Sanctions).  Although the Court stopped short of concluding that

19  PersonalWeb's destruction of evidence was intended to "gain an unfair advantage in its upcoming

---

[6] ███████████████████████████████████████████████████████
███████████████████████████████ Ex. L at 565:1-23 (Weiss Dep. Tr. Vol. II).

[7] ███████████████████████████████████████████████████████████████
██████████████████████████████████████ Ex. M at 33:21-34:3
(Drew Dep. Tr.).  ████████████████████████████████████████████████████
█████████████ *Id.* at 105:15-25.  █████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████ Ex. M (Drew Dep. Tr.) at 56:4-10.

litigation," it held that PersonalWeb executed its policy "in bad faith because it knowingly risks the destruction of potentially relevant information that would otherwise be saved by a litigation hold." *Id.* at 6.  The Court also noted that PersonalWeb had done "little to dispute" the assertion that PersonalWeb's "litigation was the object of a comprehensive business strategy whereby PersonalWeb comparatively analyzed the [True Name] patents and related technologies …, developed its StudyPods project to make use of the [True Name] patents, acquired the patents having predetermined it would pursue litigation, and filed suit as soon as StudyPods was ready for launch." *Id.* at 4.

    **B.**    <u>**PersonalWeb Relentlessly Pursued Its Unreasonable Claims Against Defendants.**</u>

On December 8, 2011—only two days after announcing the "beta release" of StudyPods—PersonalWeb filed its complaint against EMC and VMware in the Eastern District of Texas, alleging infringement of eight True Name patents.[8]  In the course of this litigation, PersonalWeb accused at least ten products of infringing the eight asserted patents.  Ex. N at 3 (PersonalWeb's Disclosure of Asserted Claims and Infringement Contentions EDTX Patent Rule 3-1, No. 6:11-cv-660 (E.D. Tex. July 2, 2012)).

    **1.**    **PersonalWeb's Litigation Tactics Forced Defendants to Incur Needless Costs.**

From the start, PersonalWeb seemed intent on driving up the Defendants' costs.  ***First***, in its complaint, PersonalWeb claimed to own "all rights and interest" in each of the asserted patents. Public records on file with the Patent Office at the time confirmed, to the contrary, that the asserted patents were co-owned by PersonalWeb and an unrelated party, Level 3 Communications, LLC ("Level 3").  *See* Defs.' Mot. to Dismiss (E.D. Tex. ECF No. 12).  Defendants were compelled to file a motion to dismiss in light of PersonalWeb's lack of standing, after which PersonalWeb

---

[8] On the same day, it filed complaints against eight other cloud computing companies—Amazon, Autonomy/HP, Caringo, Dropbox, Google/YouTube, NEC, NetApps, and Nexsan.  Ex. O (PersonalWeb press release, dated Dec. 8, 2011).

amended its complaint to add Level 3 as a plaintiff.  *See* Defs.' Mot. to Dismiss (E.D. Tex. ECF No. 12); First Am. Compl. (E.D. Tex. ECF No. 19).

*Second*, despite the strong ties of all parties, the patents, and the evidence to California, PersonalWeb brought suit in the Eastern District of Texas in a blatant attempt at forum shopping. The asserted patents had been owned and controlled by three California-based companies for more than nine years, and were being asserted against yet another set of California-based products. Moreover, Brilliant had previously asserted the patents at least ***three times*** in California and successfully opposed an effort to transfer one of those cases to New York, claiming that litigating ***outside*** California would impose "substantial hardship and burden."  *See* Def.'s Mot. to Transfer Venue at 6 (E.D. Tex. ECF No. 13).  Given the improper venue—and Brilliant's gamesmanship in trying to gain Texas venue by setting up a new Texas subsidiary[9]—EMC and VMware were forced to incur significant expense to secure a transfer of the case to the appropriate jurisdiction.  For example, EMC and VMware filed three substantive briefs (with extensive declarations) and took the deposition of two PersonalWeb employees as part of the successful transfer proceedings.  *See, e.g.*, E.D. Tex. ECF Nos. 13, 27, & 41.

*Third*, PersonalWeb refused to stay the case even after it was placed on notice of the grounds for invalidity of the True Name patents and after the PTAB instituted IPR proceedings.  On December 14, 2012, Defendants served its invalidity contentions and prior art references demonstrating that the basic premise of the patents was false and that the inventors were ***not*** the first to use "content-based identifiers" to manage data items.  These extensive contentions were 88 pages long (not including more than 2500 pages of detailed claim charts) and identified dozens of invalidating prior art references.  *See* Ex. C (Dec. 14, 2012 Invalidity Contentions).  Then, between December 15-17, 2012, EMC and VMware filed a series of IPR petitions with the PTAB,

[9] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
Ex. M (Drew Depo. Tr.) at 57:12-20.

challenging all claims that had been asserted against them for six[10] of the asserted eight True Name patents under 35 U.S.C. § 102 and § 103.  The PTAB instituted all six petitions.  *See* Ex. P ('791 Final Written Decision); Ex. Q ('280 Final Written Decision); Ex. R ('544 Final Written Decision); Ex. S ('539 Final Written Decision); Ex. T ('662 Final Written Decision); Ex. U ('096 Final Written Decision). Despite the PTAB's decision on institution—finding that Defendants had a "reasonable likelihood" of prevailing, 35 U.S.C. § 314(a)—PersonalWeb refused to consent to a stay of the district court case pending the IPR proceedings.  Again, PersonalWeb forced EMC and VMware to bear the cost of bringing this issue to the Court, which issued the stay on January 13, 2014.  *See* Defs.' Mot. to Stay Pending *Inter Partes* Review (ECF No. 8); Order Granting Defs.' Mot. to Stay (ECF No. 41).

> ### 2. The PTAB and Federal Circuit Found All of the True Name Patents Challenged by EMC and VMware Invalid.

The eight asserted patents in this litigation are all part of a family of patents that PersonalWeb calls the "True Name" patents.  The original patent application that spawned the "True Name" family of patents was filed on April 11, 1995.  '310 patent at [60].  At the heart of these patents is a claim—repeatedly demonstrated as erroneous—that the named inventors were the first to invent the use of "content-based identifiers" to manage data items:

> In *all* of the prior data processing systems the names or identifiers provided to identify data items … are *always* defined relative to a specific context.  For instance, the file identified by a particular file name can only be determined when a directory containing the file (the context) is known.
>
> …
> In prior art systems for identifying data items there is *no* direct relationship between the data names and the data item.

*Id.* at 2:26-40 (emphasis added).

Based on this premise, the True Name patents claimed as inventive the use of content-based inventors, based on "hashes" of data items, for a wide range of digital management tasks, including to: identify and access data items (U.S. Patent No. 5,798,791 (the "'791 patent")); to request files

---

[10] EMC and VMware filed IPR petitions on the '791, '281, '544, '539, '662, and '096 patents.

1   distributed across a network (U.S. Patent No. 6,415,280 (the "'280 patent")); to determine if access

2   to a data item is licensed or authorized (the '310 patent), to limit access to files to licensed or

3   authorized parties (U.S. Patent No. 6,928,442 (the "'442 patent")); to access different portions of a

4   file (U.S. Patent No. 7,945,539 (the "'539 patent")); to track and map data in the system (U.S.

5   Patent No. 7,945,544 (the "'544 patent")); to de-duplicate files (U.S. Patent No. 7,949,662 (the

6   "'662 patent")); or to store and access files that are broken into segments (U.S. Patent No. 8,001,096

7   (the "'096 patent")).

8       However, as the overwhelming evidence in the record demonstrates—including the multiple

9   prior art references cited in Defendants' invalidity contentions and IPR petitions—the use of

10  "content-based" identifiers for file-management purposes was already well-known and fully

11  disclosed in the prior art.  Indeed, the data-processing concepts described in the patents-at-issue are

12  identical to the concepts used by multiple prior art inventors.

13      The PTAB proceedings confirmed, indisputably, that the basic premise underlying the True

14  Name patents was wrong.  On May 15, 2014, the PTAB invalidated **all** challenged claims of **all** six

15  patents in the IPR petitions brought by EMC and VMware, on **every** instituted ground of

16  invalidity.[11]  *See* Joint Status Report (ECF No. 61); *see also* Ex. P ('791 Final Written Decision);

17  Ex. Q ('280 Final Written Decision); Ex. R ('544 Final Written Decision); Ex. S ('539 Final Written

18  Decision); Ex. T ('662 Final Written Decision); Ex. U ('096 Final Written Decision).  The PTAB

19

---

20  [11] Even during the IPR proceedings, PersonalWeb also employed obstructive tactics in an effort to
    drive up costs.  For example, PersonalWeb issued sweeping evidentiary objections to EMC's
21  supplemental exhibit list and requested that all of EMC's exhibits be expunged from the record for
    each trial.  PersonalWeb's failure to tailor its objections to the individual exhibits proposed and
22  individual trials pending prompted the PTAB to admonish PersonalWeb.  In its June 19, 2013
    Order, the PTAB reminded PersonalWeb that "[f]iling the same broad evidentiary objection in all
23  six trials, without considering whether such an objection would be meaningful for the particular
    trial, causes unnecessary delay and increases costs to the Board and opposing party."  Ex. V (Order
24  on Conduct of the Proceeding, Case Nos. IPR2013-00082, 83, 84, 85, 86, 87 (PTAB June 19,
    2013)).  Moreover, the PTAB warned PersonalWeb it was authorized to issue sanctions where
25  necessary to ensure the just, speedy, and inexpensive resolution of every proceeding.  *See id.* at 3 n.4
    (citing 37 C.F.R. § 42.1(b); 35 U.S.C. § 316(a)(6) ("The Director shall prescribe regulations ... (6)
26  prescribing sanctions for abuse of discovery, abuse of process, or any other improper use of the
    proceeding, such as to harass or *to cause unnecessary delay or an unnecessary increase in the cost*
27  *of proceeding.*" (emphasis in original))).

28

---

1   rejected the claims-at-issue based on multiple grounds and multiple prior art references,[12]

2   confirming that the claims' validity was not a close call.  Each of these references disclosed exactly

3   the same type of "content-based identifiers" that the True Name inventors claimed to have invented.

4          On May 21, 2014—after the PTAB found all asserted claims of six of the eight asserted

5   patents unpatentable—EMC formally requested that PersonalWeb withdraw its district court

6   complaint.  *See* Ex. B (Letter from EMC to Hadley (May 21, 2014)).  But PersonalWeb did not

7   dismiss its suit and instead challenged the decisions of the PTAB on appeal—leading the Federal

8   Circuit to summarily affirm each of the PTAB's decisions in Defendants' IPRs.  *See* Ex. W

9   (Judgment, *PersonalWeb Techs., LLC v. EMC Corp. & VMware, Inc.*, Nos. 2014-1602, 2014-2013,

10  2014-1604, 2014-1605, 2014-1606, 2014-1607 (Fed. Cir. Aug. 10, 2015)).

11      **C.**    **PersonalWeb Continued Its Litigation Against EMC and VMware Even After**
12              **the IPRs**

13          Following the Federal Circuit's affirmance, the case against EMC and VMware remained

14  stayed for several more years because of a still-pending IPR petition brought by Apple Inc.,

15  covering all asserted claims of the '310 patent.[13]  During those proceedings, the PTAB twice

16  determined that the asserted claims of the '310 patent were unpatentable.  *See PersonalWeb Techs.,*

17  *LLC v. Apple, Inc.*, 917 F.3d 1376, 1378, 1381 (Fed. Cir. 2019).  The Federal Circuit reversed—but

18  only on the narrow ground that the particular prior art at issue did not sufficiently disclose

19  comparing the content-based identifier to a plurality of identifiers (as opposed to a single identifier)

20  for purposes of authorization.  *See id.* at 1382-1383.  However, the Federal Circuit and other courts

21  in this district have found that this kind of comparison is a plainly abstract principle under Section

22

23

24  [12] In fact, the prior art grounds on which the PTAB relied were first identified in Defendants'

25  comprehensive invalidity contentions, served on December 14, 2012.  *Compare* Ex. P at 66 ('791
    Final Written Decision), Ex. Q at 41-42 ('280 Final Written Decision), Ex. R at 57-58 ('544 Final

26  Written Decision), Ex. S at 76-77 ('539 Final Written Decision), Ex. T at 41 ('662 Final Written
    Decision), *and* Ex. U at 54 ('096 Final Written Decision), *with* Ex. C (Dec. 14, 2012 Invalidity

27  Contentions).

28  [13] The '310 patent was not part of EMC's and VMware's IPR petitions.

1   101, as further confirmed by this Court's subsequent invalidation of the '310 patent on those

2   grounds.

3        The stay of the case against EMC and VMware was lifted on June 24, 2019, and the instant

4   litigation resumed for the two remaining patents: the '442 patent and the '310 patent.  Order Setting

5   Status Conference (ECF No. 62).  Although PersonalWeb dropped the '442 patent,[14] it continued to

6   pursue its claims on the '310 patent—despite clear infirmities with its claims and without regard to

7   the significant continuing cost it was imposing on Defendants.  On September 14, 2019, Defendants

8   again formally requested that PersonalWeb withdraw its complaint on the '310 patent.  Ex. Y (Letter

9   from Vreeland to Hadley (Sept. 14, 2019)).  As Defendants pointed out in their letter,

10  PersonalWeb's substantial disclaimers on claim scope during the IPR proceedings confirmed that

11  that the Defendants did not infringe the '310 patent.  *Id.* at 2-4.  Defendants also reminded

12  PersonalWeb that the remaining patents could not possibly survive scrutiny under Section 101,

13  including because the Federal Circuit and this Court had both issued multiple decisions finding

14  claims similar to those in the '310 patent ineligible for patent protection.  *Id.* at 4.  Defendants

15  provided the same notice in public filings.  *See* Joint Case Management Statement at 5-6 (ECF No.

16  69); Defs.' Mot. for Leave to Amend Invalidity Contentions (ECF No. 71).  But PersonalWeb

17  waved away this argument, contending that "[t]he claims of the '310 patent are far from abstract

18  ideas" and urging the Court not to stay discovery pending resolution of Defendants' proposed

19  motion for judgment on the pleadings.  Joint Case Management Statement at 3-4 (ECF No. 69).

20       Over PersonalWeb's objections, the Court did not reopen discovery and instead authorized

21  briefing on the Section 101 issue.  Order Regarding 101 Motion Schedule (ECF No. 77).  On

22  November 22, 2019, Defendants moved for judgment on the pleadings on the '310 patent, arguing

23  that judgment was warranted because the asserted claims were drawn on non-patentable subject

24  matter under Section 101—specifically, the use of known content-based identifiers to control access

25

26  [14] PersonalWeb voluntarily dismissed its claims with respect to the '442 patent following the PTO's

27  invalidation of certain of the '442 patent claims during reexamination proceedings.  *See* Order of
    Dismissal with Prejudice (ECF No. 68); Ex. X (Mar. 20, 2019 Final Rejection, Reexamination No.

28  90/013,764).

---

to data in a computer system.  *See generally* Defs.' Mot. for J. on the Pleadings (ECF No. 78).  Nevertheless, PersonalWeb ignored the plain teachings of these cases and maintained its fundamentally flawed infringement claims for the '310 patent.  Indeed, in an effort to conjure an issue of fact and avoid an adverse decision, PersonalWeb brought in a new technical expert, who filed a declaration that directly contradicted the prior rulings at the PTAB and the Federal Circuit and PersonalWeb's and its prior expert's admissions during the IPR proceedings.  *See* Pls.' Opp. to Mot. for J. on the Pleadings (ECF No. 80); *see also* Reply in Supp. of Mot. for J. on the Pleadings at 1-6 (ECF No. 81) (detailing inconsistencies in PersonalWeb's arguments).

On January 29, 2020, the Court granted Defendants' motion for judgment on the pleadings, holding the '310 patent (along with the '662 patent and '280 patent asserted in related litigation against other parties) invalid.  *See* Order Granting Defs.' Mot. for J. on the Pleadings (ECF No. 82); *see also* Am. Order Granting Defs.' Mot. for J. on the Pleadings (ECF No. 84).  In reaching that conclusion:

- The Court found that the '310 patent claimed the abstract, "fundamental concept" of "accessing … data in a multi-computer network system," Am. Order Granting Defs.' Mot. for J. on the Pleadings at 17 (ECF No. 84);

- The Court found that the claims added no "inventive concept" because the "concept-based identifiers" recited in the claims were merely generic computer functions, *id.* at 21-24;

- The Court rejected PersonalWeb's desperate and untimely attempt to manufacture a factual issue through a new expert declaration that contradicted much of the unambiguous IPR record, *id.* at 10-12;

- The Court noted that "[a]llowing the three True Name patents to survive Section 101 would allow Plaintiff to monopolize the entire field of data storage," *id.* at 24.

Final judgment entered in favor of Defendants on the same day.  *See* Judgment (ECF No. 83).

**D.      PersonalWeb Continued to Expand Its Litigation Campaign Exponentially, Even as the IPRs Revealed the Fundamental Flaws in the True Name Patents.**

Even as the district court litigation and IPRs revealed the defects in the True Name patents, PersonalWeb continued to expand its litigation campaign.  In 2012—about one year after filing suit against the Defendants in this case—PersonalWeb asserted largely the same claims involving the

same True Name patents against another round of defendants—including against Apple, Rackspace, Facebook, Microsoft, Yahoo, and IBM in the Eastern District of Texas.[15]  And PersonalWeb's litigation campaign persisted even after the True Name patents expired.  Indeed, PersonalWeb again asserted the True Name patents in January 2018 against more than fifty additional Internet companies based on their use of Amazon's cloud-computing services.  *See In re PersonalWeb Techs., LLC, & Level 3 Commc'ns, LLC, Patent Litig.*, MDL No. 2834, 340 F. Supp. 3d 1373 (J.P.M.L. 2018).  These cases were filed in five separate districts—the Northern District of California, the Central District of California, the Eastern District of Texas, the Southern District of New York, and the Eastern District of New York.  *Id.* at 1375.

## E.    PersonalWeb Was on Notice of the Fundamental Weaknesses in its Case

As indicated above, Defendants notified PersonalWeb of the fundamental flaws in its asserted True Name patents on several occasions.  For example, Defendants served exhaustive invalidity contentions in December 2012—including the same prior art references upon which the PTAB relied in invalidating six of the True Name patents.  Ex. C (Dec. 2012 Invalidity Contentions).  In May 2014, after the PTAB invalidated those patents, EMC again placed PersonalWeb on notice, noting that "the PTAB rejected the claims based on multiple grounds and multiple references, confirming that the claims' validity was not a close call."  Ex. B at 1 (Letter from EMC to Hadley (May 21, 2014)).  EMC similarly noted that PersonalWeb's refusal to stay the case pending the successful IPRs had needlessly driven up costs.  *Id.*  And in September 2019, after the stay was lifted and the '442 patent was dismissed, Defendants again wrote to PersonalWeb— noting that PersonalWeb's concessions in the IPRs confirmed that the '310 patent was not infringed, that the '310 patent was invalid under Section 101, and that the '310 patent was invalid based on

---

[15] *See PersonalWeb Techs. LLC et al. v. Apple Inc.*, C.A. 6:12-cv-00660 (E.D. Tex.); *PersonalWeb Techs. LLC et al. v. Rackspace US Inc. et al.*, C.A. 6:12-cv-00659 (E.D. Tex.); *PersonalWeb Techs. LLC et al. v. Facebook Inc.*, C.A. 6:12-cv-00662 (E.D. Tex.); *PersonalWeb Techs. LLC et al. v. Microsoft Corp.*, C.A. 6:12-cv-00663 (E.D. Tex.); *PersonalWeb Techs. LLC et al. v. Yahoo Inc.*, C.A. 6:12-cv-00658 (E.D. Tex.); *PersonalWeb Techs. LLC et al. v. Nexsan Techs. Inc.*, C.A. 6:12-cv-00657 (E.D. Tex.); and *PersonalWeb Techs. LLC et al. v. Int'l Business Machines Corp.*, C.A. 6:12-cv-00661 (E.D. Tex.).

1    multiple prior art systems.  Ex. Y (Letter from Vreeland to Hadley (Sept. 14, 2019)).  But on each

2    occasion, PersonalWeb refused to reassess the case and to dismiss its claims.

3    **III.    ARGUMENT**

4         A court may award the prevailing party attorneys' fees in patent cases in "exceptional

5    cases."  35 U.S.C. § 285.  In *Octane Fitness*, the Supreme Court explained that "an 'exceptional'

6    case is simply one that stands out from others with respect to the substantive strength of a party's

7    litigating position (considering both the governing law and the facts of the case) or the unreasonable

8    manner in which the case was litigated."  134 S. Ct. at 1756.  An exceptional case determination

9    must be made "considering the totality of the circumstances."  *Id.*

10        Both grounds identified in *Octane Fitness* separately and independently warrant an award of

11   fees.  *First*, "unreasonable" litigation conduct is independently sufficient to justify an award of fees

12   under *Octane Fitness*.  *See* 134 S. Ct. at 1756.  A party's conduct may be sufficiently

13   "unreasonable" to justify an award of fees, without being "independently sanctionable."  *Id.* at 1756-

14   57.  *Second*, the "substantive strength" (or lack thereof) of a party's litigation positions is also

15   sufficient, alone, to justify an award of fees.  *Id.* at 1756.  Courts have pointed to a plaintiff's

16   unreasonable disregard of facts that contradicted its substantive allegations as a basis for fee awards.

17   *See, e.g.*, *Yufa v. TSI Inc.*, No. 09-cv-1315-KAW, 2014 WL 4071902, at *3-5, 8 (N.D. Cal. Aug. 14,

18   2014) (finding plaintiff's "continued prosecution of th[e] action … objectively unreasonable" and

19   awarding attorneys' fees where defendant provided discovery demonstrating that plaintiff's

20   infringement theory was without merit).

21        Adopting the Supreme Court's guidance in *Octane Fitness*, district courts in this circuit have

22   awarded fees in numerous patent litigations, including in cases with facts similar to those presented

23   here.  *See, e.g.*, *Munchkin, Inc. v. Luv N'Care, Ltd.*, No. CV 13-06787 JEM, 2018 WL 7504404, at

24   *6 (C.D. Cal. Dec. 27, 2018) (finding plaintiff's "doggedness in the face of almost certain defeat"—

25   for example, fighting defendant's motion to stay following institution of IPR proceedings and

26   failing to explore settlement either before or after the outcome of the IPRs—"was unreasonable"),

27   *appeal docketed*, No. 19-1454 (Fed. Cir.); *Logic Devices, Inc. v. Apple Inc.*, No. 13-cv-2943-WHA,

28   2014 WL 6844821, at *4-5 (N.D. Cal. Dec. 4, 2014) (awarding fees following summary judgment

---

1  of invalidity due to the "unreasonable manner" in which the case was litigated, including that

2  plaintiff ignored "repeated warnings about the invalidity" of only asserted claim).

3       As in those other matters, this case warrants a fee award based on both the "unreasonable

4  manner in which the case was litigated" by PersonalWeb and the "substantive strength of

5  [Defendants'] litigating position." *Octane Fitness*, 134 S. Ct. at 1756.

6      **A.**    <u>**PersonalWeb Asserted its Patents in an Unreasonable Manner, Using Improper**</u>
7              <u>**Litigation Tactics**</u>

8       PersonalWeb's "unreasonable" litigation conduct is an independent basis for an award of

9  fees under *Octane*.  Specifically, PersonalWeb litigated this case in an unreasonable manner—not

10  only by continuing the case long after PersonalWeb should have recognized the intractable

11  substantive problems with the validity of its patents, but also by engaging in improper litigation

12  tactics throughout the litigation.

13       As discussed above, in the face of—and perhaps because of—the clear invalidity issues with

14  the True Name patents, PersonalWeb litigated the case in a way that consistently and repeatedly

15  maximized Defendants' costs of defense.  For example:

16      •  The prior owner of the patents transferred the asserted patents to PersonalWeb, a phony
17         company in Tyler, Texas, after announcing its intention to file this lawsuit in an effort to
18         artificially establish ties in a purportedly favorable forum.  Although PersonalWeb
        claimed, at one point, to be the creator of an "educational social networking product,"
19         called "StudyPods"—PersonalWeb's website, its employees, and its product goals were
        all a facade.  PersonalWeb's true mission—to assert the flawed True Name patents
20         against successful cloud-computing companies in the hopes of a quick payday—became
        clear when, according to the testimony of former PersonalWeb employee Jacob Drew,
21         PersonalWeb "specifically instructed [its employees] to incorporate the [True Name]
        patents [in the StudyPod products] to ensure a bigger award in an infringement action,"
22         and then filed serial lawsuits against dozens of companies in different industries.  Ex. A
        at 3 (Order Granting in Part Defs.' Mot. for Sanctions); Ex. H (PersonalWeb press
23         release dated Dec. 6, 2011); Ex. O (PersonalWeb press release dated Dec. 8, 2011).

24      •  PersonalWeb systematically deleted relevant emails it was under a duty to preserve in
25         anticipation of the litigation, leading this Court to issue sanctions.  Indeed, employees
        were instructed to "delete all unnecessary emails by [October] 12th"—months after
26         PersonalWeb began openly discussing its plan to file the suit and two months before the
        instant suit was filed—because CEO Michael Weiss "did not want massive amounts of
27         email to go in through discovery."  *See* Ex. A at 2-3, 5 (Order Granting in Part Defs.'
        Mot. for Sanctions).

28

- PersonalWeb failed to join a **co-owner** of the asserted patents, Level 3—forcing Defendants to expend significant resources on motion practice due to PersonalWeb's lack of standing.  Defs.' Mot. to Dismiss (E.D. Tex. ECF No. 12).

- PersonalWeb opposed Defendants' motion to transfer the case to this district despite that the prior owner of the True Name patents, Brilliant, had previously asserted the patents at least **three times** in California and successfully opposed an effort to transfer one of those cases to New York, claiming that litigating **outside** California would impose "substantial hardship and burden" due to the strong ties of all parties, the patents, and the evidence to California.  Def.'s Mot. to Transfer Venue at 6 (E.D. Tex. ECF No. 13).

- PersonalWeb refused to consent to a stay of the district court action pending IPRs on all asserted patents—after the PTAB found that Defendants had a "reasonable likelihood" of prevailing in challenging all of the asserted claims—again forcing EMC and VMware to expend significant resources on motion practice.  Defs.' Mot. to Stay Pending *Inter Partes* Review (ECF No. 8).

- PersonalWeb attempted to delay the conclusion of the IPR proceedings by filing the same broad evidentiary objections in all six trials, without considering whether such an objection was appropriate for a particular trial, leading the PTAB to threaten PersonalWeb with sanctions.  Ex. V at 3 (Order on Conduct of the Proceeding, Case Nos. IPR2013-00082, 83, 84, 85, 86, 87 (PTAB June 19, 2013).

- PersonalWeb opposed a stay of discovery pending resolution of Defendants' meritorious motion for judgment on the pleadings for the '310 patent.  Joint Case Management Statement at 3-4 (ECF No. 69).

- PersonalWeb brought largely the same weak claims against more than fifty companies in disparate industries in different jurisdictions.  *See In re PersonalWeb Techs., LLC, & Level 3 Commc'ns, LLC, Patent Litig.*, 340 F. Supp. 3d at 1373 n.1.

This type of conduct is a sufficient basis for a fee award under Section 285.  *See, e.g.*, *Monolithic Power Sys. Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013) (citing the "well-established [rule]" that litigation misconduct and unprofessional behavior may suffice, by themselves, to make a case exceptional under § 285" (citation and internal quotation marks omitted) (alteration in original)).

Other courts have arrived at similar conclusions.  For example, in *Munchkin*, the district court based its fees award in part on the plaintiff's refusal to stay district court litigation pending IPR proceedings that were ultimately successful.  2018 WL 7504404, at *6.  In *ReedHycalog UK, Ltd. v. Diamond Innovations Inc.*, the court found that litigation misconduct warranted fees where the defendants "repeatedly burdened the Court with unnecessary motion practice throughout this

case." No. 6:08–CV–325, 2010 WL 3238312, at *6 (E.D. Tex. Aug. 12, 2010).  In *Large Audience Display Systems, LLC v. Tennman Productions, LLC*, the Federal Circuit affirmed an award of fees based in part on the plaintiff's opposition to a motion to transfer the case from the Eastern District of Texas to the Central District of California.  745 Fed. App'x 153, 154-55 (Fed. Cir. 2018).  And in *My Health, Inc. v. ALR Techs., Inc.*, the court awarded fees based on its findings that the plaintiff's "litigation campaign was extensive—31 lawsuits, 11 declaratory judgment actions, and 5 IPRs—all without a determination on the merits until 2017, five years after My Health's campaign began.… [T]he number of lawsuits filed by My Health, many of which settled right on the cusp of a merits determination (most for similar amounts), supports the conclusion that My Health was filing lawsuits 'for the sole purpose of forcing settlements, with no intention of testing the merits of [the] claims.'" No. 2:16-cv-00535-RWS-RSP, 2017 WL 6512221, at *5 (E.D. Tex. Dec. 19, 2017) (quoting *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015)).  The reasoning in these cases applies with equal force here.

### B.   PersonalWeb Pressed Its Claims Despite Clear Notice that They Were Exceptionally Weak on the Merits

PersonalWeb's unreasonable litigation conduct appears to have resulted from a concerted effort on PersonalWeb's part to distract from the weakness of its patent claims.  Those weaknesses were unusually clear in this case, and they led directly to the unique result of (1) the PTAB's across-the-board rulings for EMC and VMware in their IPRs challenging all asserted claims of six of the eight asserted patents, (2) the voluntary dismissal (with prejudice) of the seventh asserted patent, and (3) the invalidation of the eighth (and final) asserted patent by this Court under Section 101. *See supra* Section II.B-II.C.  The substantive deficiencies in the asserted patents were known to PersonalWeb and its counsel long before judgment issued in favor of Defendants, yet they persisted in litigating this case and burdening EMC, VMware, and their employees.

The eight True Name patents asserted in this case all share the same specification and priority date.  The True Name patents were the result of a concerted effort to claim protection for basic data-processing functions, tied together by the named inventors' core assertion in the patents—one proven indisputably false at the outset of the litigation—that they were the first to

invent the use of "content-based identifiers" for data items in computer system.  Such identifiers were, in fact, long known in the industry and their application in file management was not novel—a fact confirmed repeatedly throughout this litigation.  On December 14, 2012, Defendants first exposed this fatal flaw with PersonalWeb's assertions when they served their extensive invalidity contentions.  *See* Ex. C (Defs.' Dec. 14, 2012 Invalidity Contentions).  And later that month, Defendants also filed their IPR petitions against six of the asserted patents, reiterating the grounds for invalidity under 35 U.S.C. § 102 and § 103.  The PTAB confirmed the weakness of PersonalWeb's case when it ruled for EMC and VMware on all challenged and asserted claims for those six patents.[16]  Exs. P-U (Final Written Decisions).  The Federal Circuit's summary affirmance put the issue to rest.  Ex. W (Federal Circuit Judgment).

On at least two further occasions—after the PTAB issued its Final Written Decisions in 2014 and after this Court lifted the stay in 2019—Defendants put PersonalWeb on notice that its claims were without merit and warned that Defendants would seek it attorneys' fees if PersonalWeb chose to proceed with the litigation.  *See* Ex. B (Letter from EMC to Hadley (May 21, 2014); Ex. Y (Letter from Vreeland to Hadley (Sept. 14, 2019)).  Still, PersonalWeb persisted.

In September 2019, after the district-court stay was lifted, PersonalWeb voluntarily dismissed its claims with respect to the '442 patent with prejudice, leaving only the '310 patent in the case.  At that time, Defendants alerted PersonalWeb and the Court to the fact that the only remaining patent, the '310 patent, was invalid under Section 101.  *See* Ex. Y (Letter from Vreeland to Hadley (Sept. 14, 2019)); Joint Case Management Statement at 5-6 (ECF No. 69).  And yet again, PersonalWeb forced Defendants to undergo expensive motion practice—including by introducing brand-new expert opinions in its opposition papers.  This Court correctly rejected PersonalWeb's arguments and identified them as an effort to "monopolize the entire field of data storage."  Am. Order Granting Defs. Mot. for J. on the Pleadings at 24 (ECF No. 84).  As such, the Court granted

---

[16] In fact, ***all*** of the ultimately invalidating references presented to and relied upon by the PTAB were included in Defendants' 2012 invalidity contentions.  *Compare* Ex. C (Defs.' Dec. 14, 2012 Invalidity Contentions), *with* Exs. P-U (Final Written Decisions).

1  Defendants' motion for judgment on the pleadings under Section 101, finding that asserted claims of

2  the '310 patent covered abstract ideas with no inventive concept.  *See id.*

3  During litigation, a patent owner has a "duty to continually assess its patent infringement

4  claim."  *Munchkin*, 2018 WL 7504404, at *6 (citing *Taurus IP, LLC v. Daimler Chrysler Corp.*, 726

5  F.3d 1306, 1328 (Fed. Cir. 2013).  On at least three separate occasions, Defendants specifically put

6  PersonalWeb on notice that its claims were baseless: first in Defendants' December 2012 invalidity

7  contentions and IPR petitions, then again in correspondence after Defendants prevailed in the IPR

8  proceedings in 2014, and finally in correspondence after the stay was lifted in 2019.  *See* Ex. C

9  (Defs.' Dec. 14, 2012 Invalidity Contentions); Ex. B (Letter from EMC to Hadley (May 21, 2014));

10  Ex. Y (Letter from Vreeland to Hadley (Sept. 14, 2019)).  Indeed, in their two letters on the subject,

11  Defendants expressly stated that they would seek attorneys' fees if PersonalWeb chose to proceed

12  with the litigation.  Despite these warnings and despite its duty to reassess the strength of its claims,

13  PersonalWeb relentlessly continued to pursue those meritless claims against Defendants.

14  PersonalWeb's persistence warrants an award of attorney fees, just as other courts have

15  awarded such fees under similar circumstances.  For example, in *Munchkin*, the court found the

16  plaintiff's conduct "in persisting in all out litigation" was "objectively unreasonable" for many of

17  the same reasons that PersonalWeb's behavior in the instant case is objectively unreasonable.  2018

18  WL 7504404, at *6.  Among other things, the plaintiff in *Munchkin* ignored the "red flag warnings"

19  in the asserted prior art—and instead "fought LNC's Motion to Stay the litigation pending the

20  outcome of the IPR," "failed to explore settlement before or after the outcome of the IPR,"

21  "appealed PTAB's decision to the Federal Circuit," and "sought a voluntary dismissal under rule

22  41(a)(2) in an attempt to avoid a final judgment that would establish LNC as the prevailing party."

23  *Id.*  In light of this behavior, the court found that the plaintiff's "doggedness in the face of almost

24  certain defeat … makes this case stand out from other cases."  *Id.*  In *Logic Devices*, the Court found

25  that the case was "exceptional" based in part on the defendant's repeated warnings to plaintiff of the

26  asserted claim's invalidity.  2014 WL 6844821, at *4-5.  And in *My Health*, the court found the case

27  exceptional and awarded fees based on the plaintiff's opposition to the defendants' Section 101

28

---

1    motion, noting that "the weakness in My Health's § 101 position is by itself a sufficient basis for

2    finding the cases exceptional."  2017 WL 6512221, at *5.

3        PersonalWeb's conduct in the instant case is no different.  The substantive weakness of

4    PersonalWeb's claims, standing alone, make this a case in which a fee award is appropriate.  Indeed,

5    the Supreme Court has noted that Section 285 gives courts "the authority and responsibility to

6    ensure frivolous cases are dissuaded."  *Commil USA LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1930

7    (2015) (noting in dicta that non-practicing entities often "go after defendants for money, even when

8    their claims are frivolous").  There is ample justification for such dissuasion here.

9        **C.    Defendants' Requested Fees, Including for IPR Proceedings, Are Reasonable**

10       For the foregoing reasons, this case is exceptional under Section 285 and *Octane Fitness*,

11   leaving only the question of an appropriate measure of fees.[17]  Given the exceptional weakness of

12   PersonalWeb's claims, the Court should award fees for the entirety of the lawsuit—including the

13   IPR proceedings and related appellate proceeding.  But, at a minimum, it should award those fees

14   incurred ***after*** service of EMC's and VMware's invalidity contentions on December 14, 2012.  As

15   explained above, these contentions confirmed that the basic premise of the patents was

16   fundamentally flawed and identified all of the ultimately invalidating references presented to the

17   PTAB.  At that point in the litigation, PersonalWeb should have realized that its case was without

18   merit and should have withdrawn its complaint.  Because PersonalWeb did not drop its allegations

19   at that time, Defendants incurred millions of dollars in expenses litigating the invalidity of the

20   asserted patents before the PTAB and this Court.  For that reason, it would be appropriate to award

21   Defendants with the fees expended for the IPR proceedings as well as the district court

22   proceedings.[18]  *See PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1568-69

---

24   [17] Pursuant to the parties' approved stipulation for bifurcated briefing on fees, the appropriate
25   amount of fees will be briefed only if the Court makes a predicate finding that the case is
     "exceptional" under Section 285, as Defendants request here.  *See* Order Granting Stipulated
26   Request Regarding Extension of Deadlines and Bifurcated Briefing Schedule on Attorneys' Fees,
     (ECF No. 86).

27   [18] Furthermore, numerous courts have noted the significant and asymmetrical costs imposed by non-
28   practicing entities ("NPEs"), such as PersonalWeb, in litigations like this, and courts have suggested
     that an award of attorney fees is an appropriate remedy to address these asymmetrical burdens.

---

(Fed. Cir. 1988) (awarding attorney fees incurred during reissue proceedings before PTO); *Munchkin*, 2018 WL 7504404, at *7 (awarding fees incurred in proceedings before PTAB and Federal Circuit because "[b]ut for the filing of the patent infringement claim in this case, LNC would not have incurred attorneys' fees and costs for the IPR and Federal Circuit appeal"); *My Health Inc.*, 2017 WL 6512221, at *6 (awarding § 285 fees against patentee, including fees accused infringer expended in filing IPR petitions because defendants' pursuit of IPR was necessarily caused by plaintiff's initiation of lawsuit); *Deep Sky Software, Inc. v. Southwest Airlines Co.*, No. 10-cv-1234-CAB (KSC), 2015 WL 10844231, at *2-3 (S.D. Cal. Aug. 19, 2015) (awarding attorney fees incurred in reexamination proceedings that invalidated asserted patent).

## IV.    CONCLUSION

PersonalWeb's refusal to acknowledge the fatal deficiencies in its patent assertions plainly makes this case exceptional.  Accordingly, EMC and VMware respectfully request that the Court find PersonalWeb responsible for Defendants' attorney fees under 35 U.S.C. § 285.

---

*DCG Sys., Inc. v. Checkpoint Techs., LLC*, No. C–11–03792 PSG, 2011 WL 5244356, at *2 (N.D. Cal. Nov. 2, 2011) (noting the "asymmetrical production burden often found in NPE cases"); *Commil*, 135 S. Ct. at 1930 (noting in dicta that NPEs often "go after defendants for money, even when their claims are frivolous," and that Section 285 gives courts "the authority and responsibility to ensure frivolous cases are dissuaded").

1   Dated:  March 11, 2020

2                                              */s/ Robert Galvin*

3                                              Robert Galvin (SBN 171508)
                                                 robert.galvin@wilmerhale.com
4                                              WILMER CUTLER PICKERING
                                                 HALE AND DORR LLP
5                                              950 Page Mill Road
                                               Palo Alto, CA 94304
6                                              Telephone:  (650) 858-6000
                                               Facsimile:  (650) 858-6100
7
                                               William F. Lee
8                                                william.lee@wilmerhale.com
                                               Cynthia D. Vreeland
9                                                cynthia.vreeland@wilmerhale.com
                                               Peter Dichiara
10                                               Peter.dichiara@wilmerhale.com
                                               WILMER CUTLER PICKERING
11                                               HALE AND DORR LLP
                                               60 State Street
12                                             Boston, MA  02109
                                               Telephone:  (617) 526-6000
13                                             Facsimile:  (617) 526-5000

14                                             *Attorneys for Defendants and Counterclaim-
                                               Plaintiffs EMC Corporation and VMware, Inc.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have

consented to electronic service are being served with a copy of this document via the Court's

CM/ECF system per Civil L.R. 5-1(h)(1) on March 11, 2020.

Dated: March 11, 2020                    */s/ Robert Galvin*
                                         Robert Galvin