LAWRENCE M. HADLEY - State Bar No. 157728
lhadley@glaserweil.com
STEPHEN E. UNDERWOOD - State Bar No. 320303
sunderwood@glaserweil.com
GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:   (310) 556-2920

Attorneys for Plaintiff
PERSONAL WEB TECHNOLOGIES, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| PERSONALWEB TECHNOLOGIES, LLC, and LEVEL 3 COMMUNICATIONS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> EMC CORPORATION and VMWARE, INC., <br><br> Defendants. | CASE NO.: 5:13-cv-01358-EJD <br><br> **PERSONALWEB'S OPPOSITION TO DEFENDANTS' MOTION FOR ATTORNEYS' FEES UNDER 35 U.S.C. § 285** <br><br> Date:  May 21, 2020 <br> Time: 9:00 a.m. <br> Before:  Hon. Edward J. Davila <br> Courtroom:  4, 5th Floor |

Glaser Weil

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................................ 4

     A.    PersonalWeb Acquired the True Name Patents Well After is Formation to
           Improve a Planned Product and to Generate Licensing Revenue ........................ 4

          1.   PersonalWeb Invested Substantial Resources in Texas in Developing
               a Product Well Before Acquiring the True Name Patents ......................... 4

          2.   PersonalWeb Acquired the True Name Patents in An Arm's Length
               Transaction .............................................................................................. 5

          3.   The Acquired True Name Patents Have Been Licensed Extensively ........ 8

     B.    PersonalWeb Pursued Its Patent Infringement Claims in a Reasonable and
           Efficient Manner ................................................................................................ 8

          1.   PersonalWeb Sought to Consolidate its Infringement Cases in a Single
               Judicial Forum to Streamline the Litigation .............................................. 8

          2.   Defendants Waited One Year Into the Case to Bring IPRs, and Then
               Did Not Challenge All Asserted Patents Or All Asserted Claims ........... 10

          3.   PersonalWeb Stopped Most Litigation Activity Pending a Decision on
               Defendants' Stay Motion Until All IPRs Were Decided ......................... 11

          4.   The Federal Circuit Twice Held that the PTAB Erred in Finding
               Claims Asserted Against Defendants Invalid over the Prior Art ............. 12

          5.   PersonalWeb In Good Faith Opposed Defendants Patent Ineligibility
               Motion, Filed Almost Eight Years Into the Case ................................... 15

     C.    PersonalWeb's Separate Cases Involved Claims Not Challenged or
           Invalidated in IPRs .......................................................................................... 15

III.    LEGAL STANDARDS ............................................................................................... 16

IV.     ARGUMENT ............................................................................................................... 17

     A.    Personalweb's Patent Infringement Claims Against Defendants Were Not
           "Exceptionally Meritless" ............................................................................... 17

     B.    Personalweb Did Not Engage In "Exceptionally Unreasonable" Litigation
           Conduct Or Pursue Its Claims In Subjective Bad Faith .................................. 21

     C.    This Court Should Not Award Fees for IPR Proceedings Even if Fees Are
           Otherwise Awarded .......................................................................................... 24

V.      CONCLUSION ........................................................................................................... 25

1

## TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Adaptix, Inc. v. Apple, Inc.*,
No. 5:13-CV-01776-PSG, 2015 WL 5158716 (N.D. Cal. Sept. 2, 2015) ................................... 21

*Akamai Techs., Inc. v. Digital Island, Inc.*,
No. 1:00-cv-11851-RWZ (D. Mass) ................................................................ 8

*Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*,
No. CV 18-707-RGA, 2020 WL 757891, (D. Del. Feb. 14, 2020) ................................. 21

*CertusView Techs., LLC v. S & N Locating Servs., LLC*,
287 F. Supp. 3d 580 (E.D. Va. 2018) ............................................................. 21

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
315 F. Supp. 3d 977 (N.D. Ill. 2018) ............................................................. 24

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
935 F.3d 1341 (Fed. Cir. 2019) ................................................................. 24

*EON Corp.IP Holdings LLC v. Cisco Sys. Inc*,
No. 12–cv–01011–JST, 2014 WL 3726170 (N.D. Cal. July 25, 2014) ......................... 17

*Garfum.com Corp. v. Reflections by Ruth*,
No. CV 14-5919-JBS-KMW, 2016 WL 7325467 (D.N.J. Dec. 16, 2016) ........................ 21

*General Motors Corp. v. Devex Corp.*,
461 U.S. 648 (1983) ............................................................................. 17

*Hockeyline, Inc. v. STATS LLC*,
No. 13-CV-1446 (CM), 2017 WL 1743022 (S.D.N.Y. Apr. 27, 2017) ......................... 18

*Intellectual Ventures II LLC v. FedEx Corp.*,
No. 2:16-CV-00980-JRG2019, 2019 U.S. Dist. LEXIS 169673 (E.D. Tex. Mar. 28, 2019) ........ 24

*In–Theatres, Inc. v. Perkins*,
190 F.2d 137 (9th Cir. 1951) ..................................................................... 17

*Kreative Power, LLC v. Monoprice, Inc.*,
No. 14-cv-02991 SI, 2015 WL 1967289, (N.D. Cal. Apr. 30, 2015) .......................... 17

*Large Audience Display Sys., LLC v. Tennman Prods.*, LLC,
745 F. App'x 153 (Fed. Cir. 2018) ............................................................... 23

*Location Based Servs., LLC v. Niantic, Inc.*,
No. 17-CV-04413 NC, 2018 WL 7569160, (N.D. Cal. Feb. 16, 2018) ....................... 18, 20

*Logic Devices, Inc. v. Apple Inc.*,
No. C 13-02943 WHA, 2014 WL 6844821  (N.D. Cal. Dec. 4, 2014) ......................... 20

*Munchkin, Inc. v. Luv N' Care, Ltd.*,
No. CV 13-06787 JEM, 2018 WL 7504404  (C.D. Cal. Dec. 27, 2018) ....................... 19

28

1825656

*My Health, Inc. v. ALR Techs., Inc.*,
   No. 216-cv-00535-RWS-RSP, 2017 WL 6512221 (E.D. Tex. Dec. 19, 2017) ............................ 20

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014) ........................................................................... 3, 6, 16, 17

*Personal Web Techs., LLC v. Apple, Inc.*,
   848 F.3d 987 (Fed. Cir. 2017) ........................................................................ 11

*PersonalWeb Techs., LLC v. Apple, Inc.*,
   917 F.3d 1376 (Fed. Cir. 2019) ...................................................................... 11

*PPG Indus., Inc. v. Celanese Polymer Specialties Co.*,
   840 F.2d 1565 (Fed. Cir. 1988) ...................................................................... 25

*ReedHycalog UK, Ltd. v. Diamond Innovations Inc.*,
   No. 6:08-cv-325, 2010 WL 3238312 (E.D. Tex. Aug. 12, 2010) .................................. 23

*SFA Sys., LLC v. Newegg Inc.*,
   793 F.3d 1344 (Fed. Cir. 2015) ...................................................................... 17

*Stone Basket Innovations, LLC v. Cook Med. LLC*,
   892 F.3d 1175 (Fed. Cir. 2018) .................................................................. 20, 24

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013) ...................................................................... 18

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
   No. 10-cv-02590 CW, 2014 WL 6068384, (N.D. Cal. Nov. 13, 2014) .......................... 17

*Vasudevan Software, Inc. v. Microstrategy, Inc.*,
   No. 11-cv-06637 RS, 2015 WL 4940635, (N.D. Cal. Aug. 19, 2015) ........................... 17

*Yufa v. TSI Inc.*,
   No. 09-cv-1315-KAW, 2014 WL 4071902, (N.D. Cal. Aug. 14, 2014) ......................... 18

**FEDERAL STATUTES**

3 U.S.C. § 285 ......................................................................................... 3, 25

35 U.S.C. § 101 .......................................................................................... 1

35 U.S.C. § 285 ............................................................................... 1, 3, 16, 17

35 U.S.C. § 286 ......................................................................................... 16

Patent Act § 285 ........................................................................................ 17

**FEDERAL RULES**

Fed. R. Civ. P. 41(a)(2) ............................................................................... 23

1825656

# I.       INTRODUCTION

PersonalWeb filed this case in December 2011, not based on a "fiction," but based on Defendants EMC and VMware's infringement of eight related "True Name" patents, which PersonalWeb had thoroughly investigated and documented.  It then litigated this case, through its counsel at McKool Smith and Glaser Weil, in a professional, fair, and efficient manner.

Defendants' motion substitutes rhetoric for facts because the facts cannot justify a fee award based on the "substantive strength" of PersonalWeb's "litigating position" or an "unreasonable manner" in which it litigated the case.  To the contrary, the true history of this case shows that:

- PersonalWeb was formed in Tyler, Texas in May 2010.  It had acquired technology and spent considerable time and money developing a new software product, well before entering an arms' length transaction to acquire ownership of the True Name patents for use in improving its product and generating licensing revenue.

- The True Name inventions that Ron Lachman and Dave Farber developed in late 1994 (well before internet's  HTTP1.1 protocols) provided novel solutions for the emerging world of distributed computing by teaching a new way of locating exact data items across disparate computer systems, independent of assigned file names.  The patents that issued have been widely licensed in multiple fields of use.

- Approximately *one year* into this case, Defendants filed IPRs citing a number of prior art references already considered by the Patent Office during examination.  But Defendants (the only parties to petition for IPRs) *did not* challenge all patents or all claims asserted against it.  Rather, Defendants intentionally elected to litigate the validity of some asserted claims in the District Court.  And before the Court, Defendants' invalidity contentions did not assert invalidity under 35 U.S.C. § 101.

- Nor did Defendants seek a stay pending the outcome of the IPRs.  Instead, Defendants EMC and VMware, and the defendants in the other seven cases, all moved to transfer the coordinated actions to the Northern District of California—even though a number of defendants, including EMC, had corporate headquarters elsewhere.  While the Court denied the transfer motions as to five defendants, it granted Defendants' transfer request, along with four other defendants, but only conditionally:  The Court concluded that the best allocation of judicial resources warranted transfer only after it construed the disputed claim terms.

- Only after Defendants were transferred to the Northern District of California did they seek to stay the case until completion of their IPR proceedings.  Although PersonalWeb opposed the stay motion (because not all asserted claims and patents had been challenged, leaving validity issues for judicial resolution), PersonalWeb did not press the litigation during the pendency of the motion.  Even then, once this Court granted the stay, PersonalWeb voluntarily agreed to extend it until all IPRs involving the asserted claims, including those later filed by other parties, had been resolved.

1

1825656

- In two separate opinions, the Federal Circuit found that the PTAB erred in finding claims asserted against Defendants invalid over the prior art.  In a more recent reexamination decision, the Patent Office rejected validity challenges to the same claims over the prior art.

- PersonalWeb stipulated to judgment as to all claims found invalid in IPR proceedings.  PersonalWeb also voluntarily dropped unchallenged claims in another asserted patent after the Patent Office found similar claims in the same patent invalid in a reexamination proceeding.

- As to the asserted claims twice upheld at the Federal Circuit, this Court permitted Defendants to raise a patent eligibility challenge jointly with defendants in two other cases before this Court.  In the meantime, the Court continued the litigation stay and vacated a pretrial schedule in the Facebook case.  Ultimately, this Court granted Defendants § 101 motion in a 24-page opinion, which PersonalWeb has appealed.

Defendants' arguments go beyond rhetoric.  They and their counsel misrepresent facts and offer outright false statements that have been considered and rejected on the merits in this *same case*.  For example, Defendants assert that PersonalWeb's cases were a "sham," and that PersonalWeb was a "shell company" and a "puppet" of Brilliant Digital Entertainment ("BDE").  They also claim that PersonalWeb's "Studypods" application was a "fictional product," that lacked "any material connection" to Texas.  (Mot. at 2.)  But none of these asserts are true.  To the contrary, as Defendants know but do not say, the Eastern District of Texas ("EDTX") Court found that "PersonalWeb is a legitimate company operating a legitimate business in East Texas."  Indeed, while BDE's CEO serves as PersonalWeb's Non-Executive Chairman, BDE owns no interest in PersonalWeb, which was formed well before BDE's subsidiary sold PersonalWeb its True Name patents.  Prior to purchasing the patents, PersonalWeb developed the StudyPods app, eventually creating a complete working code base and distributing thousands of the free app.  PersonalWeb's inability to ultimately generate revenue from the app does not make it a "fiction."

Nor did PersonalWeb file this action "in the hopes of a quick payday" or seek to "needlessly drive up litigation costs" so it could "strong-arm" unwarranted "settlements" in this and other cases.  (Mot. at 2-3.)  Defendants offer no evidence to support its false accusations.  Like the prior owner of the True Name patents, PersonalWeb sought only market-based licenses for the use of its patented technology, and remained willing to test in merits of its claims in all litigation it filed.

Defendants further assert that the True Name patents contained "substantive flaws" as

1825656

1    evidenced in the opening paragraph of U.S. Patent No. 7,802,310's specification, which allegedly

2    states a false "fundamental premise" of the invention.  (Mot. at 3).  But Defendants ignore the bulk

3    of the patent's disclosure, which explains that the invention goes beyond identifying data items

4    based on a file's content.  Rather, the invention, allows for any sized data item anywhere in a data

5    system to be located and controlled based only on its content dependent name, independent of a

6    file's user-given name.  No system at the time of the invention did this.  To the contrary, the prior

7    art illustrates the benefits that the True Names invention allowed.  In the prior art, content-based

8    identifiers could be used to determine whether a fixed-size file segment—located using a subjective

9    file name and an offset from the file's start—exactly matched the same file segment on another

10   device, and use the result eliminate the need to transfer unchanged file segments between a user's

11   computer and a backup.  In contrast, the True Name invention allowed data systems to control

12   operations like transferring data between computers based on whether any of many variable-sized

13   data items existed anywhere in the system, regardless of location or user-given name.  That's why

14   the True Names invention has been licensed to dozens over a 20 year period.

15        Indeed, EMC itself recognized the benefit of using content-based identifiers to manage data

16   within a computer network and obtained at least *13 related patents* on the very same invention.

17   EMC's True-Name imitator patents all derive from U.S. Patent 6,807,632 and claim a January 1998

18   priority date—*three years after* the True Name patents' priority date.  EMC's 13 "content identifier"

19   patents all describe and claim (i) calculating a content-based identifier for data "assets" using a hash

20   function such as an MD5, (ii) generating and storing a list of "assets" identifiers, and (iii) using the

21   asset identifiers on the list to find, retrieve or otherwise manage the assets by comparing the listed

22   identifier to the asset's identifier.  These inventions are substantively indistinguishable from what

23   Defendants describe as the "flawed" True Name patents.

24        Although PersonalWeb ultimately did not prevail before this Court, a § 285 attorney fee

25   award is not intended to be a penalty for failure to win a patent infringement case.  To recover

26   attorneys' fees, Defendants' must prove with evidence, not false rhetoric, that PersonalWeb's case

27   was either exceptionally meritless or litigated in subjective bad faith.  *Octane Fitness, LLC v. ICON*

28   *Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  Defendants prove neither *Octane* prong.  EMC

Glaser Weil

1825656

not only patented the same invention, Defendants declined to challenge some asserted claims in IPRs—tacitly recognizing that a number of PersonalWeb's asserted claims would not be invalidated. That recognition proved correct as explained in two Federal Circuit opinions and a reexamination decision.  This Court ultimately found those same claims patent ineligible.  But PersonalWeb's Section 101 arguments were well founded, not frivolous and PersonalWeb reasonably concluded that the Federal Circuit would not have affirmed the claims' validity if they were plainly patent ineligible.  PersonalWeb's decision to not dismiss its case after receiving Defendants' obligatory letters threatening a fee motion if it prevailed does not demonstrate an exceptionally weak case—it shows PersonalWeb believed in its case.  Finally, none of Defendants' complaints regarding how PersonalWeb litigated this case, even accepting the hyperbole, fit within the type of circumstances in which courts have awarded fees for subjective bad faith.  The motion should be denied.

## II.     STATEMENT OF FACTS

### A.     PersonalWeb Acquired the True Name Patents Well After is Formation to Improve a Planned Product and to Generate Licensing Revenue

Defendants' "factual background" contains numerous false statements and lack record support.  Just the first few sentences falsely claim that BDE formed PersonalWeb and still exists as its parent company.  Both conflict with findings in this case, and Defendants know it.

#### 1.     PersonalWeb Invested Substantial Resources in Texas in Developing a Product Well Before Acquiring the True Name Patents

The EDTX Court considered and rejected many of the same false statements regarding PersonalWeb that Defendants raise here.[1]  As the EDTX Court found, Claria Innovations, LLC formed PersonalWeb, Inc., in May 2010, and incorporated the company in Smith County, Texas under the laws of Texas.[2]  Within several months, PersonalWeb, Inc. reorganized into the PersonalWeb Technologies, LLC, the plaintiff in this action.[3]  Upon its formation, PersonalWeb

---

[1] *PersonalWeb Technologies, LLC v. EMC Corp.*, 6:11-cv-00660, EDTX Docket No. 103.  Citations to the record in this case prior to transfer from the EDTX Court are labeled "EDTX Docket No. __"

[2] Ex. 1 (EDTX Docket No. 103, at 4 (citing CV-683, Docket No. 81, Ex. 44)).  For the Court's convenience, cited exhibits from the EDTX record are attached to the Declaration of Lawrence M. Hadley, and cited herein as "Ex. __".

[3] *Id.*

began operating within a historic building located in Tyler, Texas, where PersonalWeb used an East Texas architect to design and construct its offices.[4]  By the time this action was filed over a year later in December 2011, PersonalWeb had six full-time employees and nine part-time employees, all based in Tyler.  A number of PersonalWeb's part-time employees were students at the University of Texas at Tyler ("UTT").[5]

Shortly after its formation, PersonalWeb began developing an application later called "StudyPods."  As conceived, StudyPods would enable "study-based search, chat and file sharing."[6] PersonalWeb created the StudyPods application "to enable students to collaborate with their peers in an online community."[7]  PersonalWeb beta tested its StudyPods with students at UTT and operated a Capstone program with UTT where UTT students designed and created elements of the StudyPods application. In support of its business operations, PersonalWeb maintained the company's electronic and non-electronic files, books, and records, in Tyler.  PersonalWeb's located its software development servers in a secure Tyler datacenter and used a Tyler ISP to access the servers.[8]

### 2. PersonalWeb Acquired the True Name Patents in An Arm's Length Transaction

Defendants' know that BDE does not have an ownership interest in PersonalWeb, and never has—but allege it anyway.  As the record shows, in late 2010, well after PersonalWeb began working on StudyPods, it learned about a development project by an Israel-based company called Topodia for a personalized research search engine focusing on natural language processing and determined that Topodia's product could provide a platform for its develop efforts.  PersonalWeb understood that Topodia was interested in working with a U.S.-based research university and believed its association UTT would be useful.[9]  This led to discussions between PersonalWeb and Kevin Bermeister, an owner in Topodia.  During these conversations, PersonalWeb learned that Mr.

---

[4] *Id.* (citing 6:11-CV-655, Docket No. 61, at 2).

[5] *Id.*

[6] *Id.* n.4 (citing 6:11-CV-683, Docket No. 81, Ex. 45, at 3).

[7] *Id.* (citing 6:11-CV-683, Docket No. 81, Ex. 46, at 2).

[8] Ex. 2 (April 4, 2012 Declaration of Michael Weiss ("Weiss Dec.") at 3.

[9] Ex. 3 (May 18, 2002 Suppl. Weiss Dec.) at 1, ¶¶ 4-5.

1825656

1   Bermeister was CEO of BDE, and that BDE had acquired a company called Kinetech.  BDE's

2   Kinetech subsidiary had been formed by the inventors of the True Name patents and still owned the

3   patents.  PersonalWeb's CEO, Mike Weiss knew about the True Name patents from his prior

4   employment at WebRadio.com, which was an early adopter of the True Name inventions for its

5   streaming radio services.  Based on his knowledge of the True Name inventions, Mr. Weiss

6   believed that the patents would be essential to the StudyPods project.[10]

7          Accordingly, PersonalWeb, Topodia, and Kinetech entered a transaction whereby (1)

8   Kinetech contributed the True Names patents to PersonalWeb and, in exchange, became a majority

9   equity investor in PersonalWeb; and (2) Topodia contributed its research search engine product and

10  natural language processor to PersonalWeb and, in exchange, became a minority equity investor in

11  PersonalWeb alongside the original owners of PersonalWeb.  The parties documented the

12  transaction in a Second Amended and Restated Company Agreement, a Contribution Agreement,

13  and an Asset Contribution Agreement.[11]

14         Defendants ignore the law of the case and falsely characterize PersonalWeb as a "shell

15  company" and a "façade," created "in a transparent attempt to manufacturer a connection to Texas

16  where there was none…."  (Mot. at 1, 5, 6).  Defendants previously made all these same allegations

17  in *this case*, and they were soundly rejected:  "PersonalWeb is a legitimate company operating a

18  legitimate business in East Texas."[12]  Defendants also assert that PersonalWeb concealed its "true

19  purpose" while preparing for litigation.  (Mot. at 5-6).  While false, PersonalWeb had no legal

20  obligation to announce its licensing or litigation plans.  Nor did any law require PersonalWeb to

21  "sell" a product practicing the True Name patents prior to initiating litigation or seeking licensing

22  revenue.  And its decision to release StudyPods as a free app, with the goal of generating revenue

23  once the app caught on (the exact business model adopted by successful dot com companies) does

24

25  [10] *Id*. at 1-2.

26  [11] *Id*. at 2 (with exhibits); Ex. 1 (EDTX Docket No. 103 at 5-6).

27  [12] Ex. 1 (EDTX Docket No. 103 at 14; *id*. at 11 ("Defendants contend BDE established and is now masquerading as PersonalWeb to establish venue in the Eastern District of Texas. *See, e.g.*, 6:11-CV-656, Docket No. 23, at 3 (referring to PersonalWeb as an "elaborate construction of a shell

28  company in Texas")….[T]he Court rejects this contention…."))

1825656

not make this case "exceptional" under *Octane*.

Defendants point to the Jacob Drew testimony about instructions to incorporate the True Name patents in StudyPods[13] to ensure a bigger damages award and other supposed PersonalWeb "misconduct," including plans for filing lawsuits and the destruction of emails.  (Mot. at 6-7).  Yet these allegations, even if true, do not fit within the *Octane* criteria for an "exceptional" case. Damage awards in patent cases are governed by legal standards.  What a lay executive may have privately told company employees has no bearing on what PersonalWeb could recover in an infringement action.  Further, communications with employees regarding plans to file lawsuits have never been the basis for awarding attorneys' fees.  Indeed, it would have been surprising if PersonalWeb did not inform its employees of its plans.  Even accepting Drew's testimony, no law bars a business "strategy" centered on acquiring widely-used patents, incorporating the patents into a product under development, and filing infringement lawsuits.  Moreover, Defendants ignore that fact that Drew's testimony already has been discredited on this same issue in this same case.  As the EDTX Court found, Mr. Drew's "testimony as a whole" was so vague, multifaceted, and bizarre" that the Court decided to give it "little, if any, weight" in Defendants' transfer motion.[14]

Finally, the issue regarding email deletion has been settled and Defendants were in no way affected.  Defendants cannot point to any emails allegedly deleted that had any relevance to PersonalWeb's claims.  The fact remains that PersonalWeb produced thousands of emails and maintains that the only emails deleted, however incorrectly, were administrative in nature and had nothing to do with its business, its products or its patent claims.  Also, Defendants never raised email destruction during this action.  Even though the Magistrate Judge sanctioned PersonalWeb for its policy of allowing employees to delete certain types of emails, the Court declined to find that PersonalWeb employees deleted emails to "gain an unfair advantage" in its patent litigation.  (Mot. at 7, Ex. A).  And PersonalWeb paid the sanction.

---

[13] Defendants overlook that Drew's testimony in this regard confirms that PersonalWeb had been developing StudyPods well before acquiring the True Name Patents.

[14] *Id.* at 12.

PERSONALWEB'S OPPOSITION TO DEFENDANTS'' ATTORNEYS' FEE MOTION

1825656

### 3.     The Acquired True Name Patents Have Been Licensed Extensively

The True Name patents have been licensed extensively to some of the largest companies in the world.  Prior to acquiring the True Name patents, Kinetech had licensed 15 companies, including Skype, Iron Mountain, Connected Corporation, Level 3 Communications, and Centergate Research Group—some non-exclusively and others exclusively within particular fields of use.  Contrary to Defendants' contention, (Mot. at 4-5), none of these licenses resulted from litigation.[15]

PersonalWeb had similar success in licensing the True Name patents.  Since acquiring the True Name patents, PersonalWeb has entered settlement and license agreements with, among others, Microsoft, IBM, YouTube, Hewett Packard, Autonomy, NEC, and Yahoo.  These were not "nuisance" value agreements.  Rather, they included license payments that reflected PersonalWeb's commitment to the merits of its infringement positions.  Many of these licenses were entered *after* IPR proceedings that invalided some claims in a number of the True Name patents, demonstrating the strength of the remaining claims.

### B.     PersonalWeb Pursued Its Patent Infringement Claims in a Reasonable and Efficient Manner

Defendants do not allege that PersonalWeb failed to conduct an adequate pre-filing investigation.  Nor could it:  Shortly after filing its case, PersonalWeb provided extensive, detailed infringement claim charts comparing every limitation in the asserted claims against each accused product.  Defendants' assertion that PersonalWeb nonetheless pursued this action in an unreasonable and inefficient manner conflicts with the record before this Court.

### 1.     PersonalWeb Sought to Consolidate its Infringement Cases in a Single Judicial Forum to Streamline the Litigation

PersonalWeb's decision to file patent infringement complaints in the EDTX was intended to streamline, not increase litigation costs.  One of the main considerations was logistics.  The accused

---

[15] Defendants assert that Kinetech "used the now invalidated True Name patents to extract settlements, and cites the Akamai litigation as an example.  (Mot. at 4 n. 3).  But even if the prior owners "extracted" settlements, that cannot warrant fees against PersonalWeb.  Moreover, a jury in the first Akamai case found the True Name patents valid but not infringed—cutting against Defendants' repeated assertions that the patents were plainly invalid," Mot. at 4.  *See Akamai Techs., Inc. v. Digital Island, Inc.*, No. 1:00-cv-11851-RWZ (D. Mass).

Glaser Weil

1  defendants were incorporated in many different states, had corporate headquarters in yet other

2  states, and developed the accused products in yet other locations, including Delaware, Texas,

3  Washington, New Jersey, California, the United Kingdom, and (for EMC) Massachusetts.[16]  Plus,

4  PersonalWeb recognized that the cases would all involve overlapping issues, including validity and

5  claim construction.  Judicial and party resources could be conserved by litigating these issues in the

6  same forum.  PersonalWeb also knew that defendants in all cases would seek much of the same

7  discovery from PersonalWeb, including documents, interrogatories, and depositions of both party

8  and third party witnesses (including the inventors).  It made sense for all this to take place in a

9  single forum, and the law on venue for patent cases at the time allowed the cases to be filed within

10  PersonalWeb's home location within the EDTX.

11     PersonalWeb also needed to consider Level 3 Communications, a company located in

12  Colorado.  Years earlier, Kinetech entered a transaction with Level 3 giving it some, but not all

13  rights in the True Name patents.  The parties had drafted the agreement as a license and restricted

14  the rights transferred, but another provision purported to give Level 3 a 50% undivided co-

15  ownership interest.  In Kinetech's prior actions, it had not joined Level 3 as a co-plaintiff (even

16  though it had the right to do so under the agreement) and no defendant had complained about Level

17  3's absence.  Accordingly, to streamline the cases, PersonalWeb did not include Level 3 as a

18  plaintiff.

19     Defendants assert that this drove up its litigation costs because they (in coordination with

20  defendants in the eight cases) were "compelled" to file motions to dismiss for lack of standing.

21  (Mot. at 8-9).  But Defendants did not bother to reach a resolution with PersonalWeb prior to filing

22  the motions.  If they had, PersonalWeb would have just done what it ultimately did:  It would have

23  sought Level 3's contractually-obligated cooperation and refiled new complaints with Level 3 as a

24  named plaintiff.  Thus, if anything, it was Defendants' search for a quick exit, rather than agreeably

25  avoiding needless motion practice, that caused Defendants to incur the motion costs.

26     As for PersonalWeb's decision to file in the EDTX, the Court partially agreed.  Over a year

27

28  [16] Ex. 1 (EDTX Docket No. 103 at 19-38).

9

1825656

into the litigation, within the cases then on file, the EDTX Court denied transfer as to the majority—

seven defendants in all—and "conditionally" granted transfer as to six, including EMC and

VMware.  But even as to the six transfers, the Court ruled that the transfers would take effect only

after it conducted *Markman* proceedings and issued a claim construction order.  Consistent with

PersonalWeb's position, the Court found that transferring prior to *Markman* would conserve

"limited judicial resources" and avoid "the risk of inconsistent claim constructions."[17]  Thus, the

EDTX Court's ultimate decision runs counter to Defendants' argument here that PersonalWeb

selected an improper forum to "force" increased litigation costs and forum shop.  (Mot. at 9).[18]

> **2.    Defendants Waited One Year Into the Case to Bring IPRs, and Then Did Not Challenge All Asserted Patents Or All Asserted Claims**

Defendants filed IPRs *a year* after PersonalWeb filed its complaint in this action.  Even after

waiting a year, Defendants did not challenge all asserted claims or even all patents.  Rather, they

elected to hedge their chances under the relatively new IPR proceedings by only challenging claims

in six of the eight asserted patents.  One of the unchallenged patents—U.S. Patent No. 6,928,442—

had been previously upheld in a reexamination.  The other challenged patent—U.S. Patent No.

7,802,310—later faced an IPR challenge by Apple, which ultimately failed to invalidate the claims

asserted against Defendants after two Federal Circuit decisions.

Defendants assert that PersonalWeb committed "misconduct" justifying an attorneys' fee

award because it did not agree to "stay" the case after receiving Defendants' invalidity contentions

and after the PTAB instituted IPR proceedings.  (Mot. at 9-10).  But Defendants never moved for a

stay based on alleged invalidity issues until August 13, 2013—approximately eight months after

serving its invalidity contentions and filing its IPRs.[19]

---

[17] *Id*. at 45-46.

[18] Defendants' base their "forum shopping" assertion on that fact that BDE previously asserted the True Name patents three times in California and successfully opposed the transfer of one case to New York, relying on Mr. Bermeister's declaration.  (Mot. at 9).  Once again, Defendants intentionally fail to disclose that they made this exact argument before the EDTX Court, and it was soundly rejected as "flawed because PersonalWeb was not a party to the prior litigations" and because "PersonalWeb did not even exist at the time of the California suits."  Moreover, "Bermeister made those statements on behalf of BDE, a California company based in Los Angeles.  PersonalWeb is a Texas company based in Tyler."  *Id*. at 17 n.16.

[19] Defendants did file a motion to stay pending a decision on its motion to transfer, which

Glaser Weil

Further, Defendants' invalidity contentions provided no compelling basis for PersonalWeb to stop litigating.  The contentions included 71 prior art patents, publications, and alleged prior offers for sale, together with charts that, while large in volume, glossed over limitations in the asserted claims.  These contentions largely relied on the same faulty analysis of the invention that Defendants have repeated throughout this case—that the "premise of the patents" claimed nothing more than the use of "'content-based identifiers' to manage data items."  (Mot. at 9).  The Federal Circuit has twice rejected Defendants' overbroad characterization of the True Name patents and found the very limitations that Defendants sidestepped in their invalidity contentions missing from the prior art.  Indeed, the first two prior art references Defendants cited in their invalidity contentions—Woodhill and Stefik—turned out to be not only the cornerstones for much of Defendants' IPR contentions, but the exact references that the Federal Circuit twice found to lack necessary limitations in the asserted claims—both times reversing the PTAB.[20]

In sum, PersonalWeb's decision to not stay the case upon receiving Defendants' infringement contentions and IPR petitions was not exceptionally unreasonable because (1) Defendants did not ask PersonalWeb to stay the case or move for a stay, (2) Defendants did not seek to invalidate all asserted claims in IPRs, (3) the Federal Circuit ultimately upheld the asserted claims in one patent as not obvious over the first two references cited in Defendants' invalidity contentions, (4) the EDTX Court ordered the parties to conduct claim construction proceedings,[21] and (5) IPRs were a relatively new procedure and little case law existed on whether courts should stay cases prior to institution—particularly when not all asserted claims had been challenged.

### 3. PersonalWeb Stopped Most Litigation Activity Pending a Decision on Defendants' Stay Motion Until All IPRs Were Decided

Defendants cannot cite any litigation activity that allegedly "drove up" its litigation costs after the EDTX Court issue its claim construction order and transferred the case to the Northern

---

PersonalWeb reasonably opposed.  EDTX Docket No. 95.  Ultimately, the EDTX Court denied that motion as moot.  EDTX Docket No. 103.

[20] *See Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987 (Fed. Cir. 2017) ("*PersonalWeb I*"); *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376 (Fed. Cir. 2019) ("*PersonalWeb II*").

[21] Ex. 1 (EDTX Docket No. 103 at 45-46).

1825656

District of California—aside from its motion to stay (which had been fully briefed by early September 2013).  That is because PersonalWeb made the reasonable decision to avoid burdening the parties and the Court with any costly activities until the Court decided Defendants' motion to stay.  Once the PTAB instituted the IPRs, PersonalWeb ceased most ongoing litigation activities except those necessary to comply with the Court's scheduling and related orders.  In fact, this Court's docket shows that following the completion of briefing on Defendants' motion to stay, the only party filings consisted of Defendants' administrative motions for more briefing on its Motion to Stay (which this Court denied) and a required Joint Case Management Statement.  This demonstrates that PersonalWeb did not employ alleged "tactics" designed to make Defendants "incur needless costs," but rather only took actions designed to obtain efficient resolution of its case on the merits and to protect its rights.

Moreover, even though the Court only granted Defendants' stay motion until the conclusion of its IPRs, PersonalWeb recognized that other parties later filed IPRs aimed at claims asserted against Defendants that they had not challenged.  Acting reasonably, PersonalWeb stipulated and the Court agreed to extend the stay until all IPRs challenging claims asserted against Defendants were resolved.

### 4. The Federal Circuit Twice Held that the PTAB Erred in Finding Claims Asserted Against Defendants Invalid over the Prior Art

Defendants' base much of their fee motion on the false assertion that the "heart" of the True Name patent family centered on an overreach— that the inventors claimed "the use of 'content-based identifiers' to manage data items."  (Mot. at 10).  But that is not what any claim in any True Name patent recites.  Defendants only support for asserting that the True Name patents claim this entire field comes from a truncated excerpt within the patents' "Background of the Invention" description. (*Id.*).  Read in full, the background explains that existing prior art systems, even when using content-based identifiers to manage computer data, still had limitations across dispersed, and perhaps dissimilar, networks because (i) such systems had "no a priori way to confirm that a given data item is in fact the one named by a data name" without "additional processing," and (ii) "two

1  different data names in the same context may refer to the same data item."[22]

2  Both prior art deficiencies existed at the time, and the asserted True Name patents all

3  contained limitations directed to making a reliable correlation between a data name and a data item

4  without "additional processing."  Defendants not only fail to identify any prior art "system" that

5  made such a correlation without additional processing in April 1995 (the priority date for the True

6  Name patents), but ignore that EMC, years later, actually applied for and received *13 related patents*

7  on the very same invention.[23]  Each patent has a January 1998 priority date and describes using a

8  content-based identifier for all data assets (*i.e.*, data items), generating and storing a list of

9  identifiers for each data item, and using the listed asset identifiers to find, retrieve, and manage the

10  assets by comparing the listed identifier to the asset's identifier.  Over two years after the True

11  Name inventors filed their initial application, EMC's own inventors explained that "a particular file"

12  in computer systems can exist "under multiple names," so that the file "can generally only be

13  accessed through identifiers or location mechanisms which . . . include information about the

14  location of the file," requiring users to access "the data through stored . . . names[,] which . . . are

15  readily changed by others."[24]  This is the exact problem that the True Name inventors had already

16  solved years earlier by using content-based identifiers to uniquely "name" data items and to locate,

17  retrieve, and control the data by comparing them to a list of stored identifiers.

18  Defendants never explain why EMC applied for 13 patents on the use of content-dependent

19  identifiers if, at the time, the True Name solution to the problem described in EMC's later patents

20  was so well known.  Nor do Defendants explain why they elected to omit certain claims and patents

21  from its IPR petitions.  There is no explanation consistent with Defendants' position now that the

22  True Name patents contain nothing inventive—a position that the Federal Circuit has twice rejected

23

24  _____

[22] '310 Patent, 2:41-47.

25  [23] See Ex. 4 (U.S. Patent No. 6,807,632); Ex. 5 (U.S. Patent No. 7,503,076); Ex. 6 (U.S. Patent No.
26  7,398,391); Ex. 7 (U.S. Patent No. 7,415,731); Ex. 8 (U.S. Patent No. 7,930,550); Ex. 9 (U.S. Patent
No. 7,475,432); Ex. 10 (U.S. Patent No. 7,591,022); Ex. 11 (U.S. Patent No. 7,793,112); Ex. 12
27  (U.S. Patent No. 7,506,157); Ex. 13 (U.S. Patent No. 7,530,115); Ex. 14 (U.S. Patent No.
7,770,228); Ex. 15 (U.S. Patent No. 7,487,551); and, Ex. 16 (U.S. Patent No. 8,074,289).

28  [24] Ex. 4 ('632 patent) at 1:53-60.

PERSONALWEB'S OPPOSITION TO DEFENDANTS'' ATTORNEYS' FEE MOTION

1825656

1  by finding that two references at the center of Defendants' IPR petitions—Woodhill and Stefik—

2  both lack the comparison step that is a critical part of the True Name inventions.[25]

3      These facts support PersonalWeb's reasonable belief in the validity of its patent claims both

4  before filing suit and during the litigation—and the Patent Office now agrees.  On January 29, 2020,

5  the Patent Office confirmed the validity of claims that PersonalWeb asserted against Defendants—

6  claims 70, 81, 82, and 86 of the '310 patent—in an instituted Reexamination proceeding.[26]  Apple

7  filed the request for reexamination based on two different prior art references—Bowne and

8  Langer—both of which Defendants raised in their IPR petitions.  In confirming patentability of the

9  challenged claims, the Patent Office confirmed that neither reference tests (*i.e.*, compares) a digital

10  identifier for a matching value "before its corresponding bit sequence [is] made available to other

11  devices."[27]  This is the same aspect of the True Name invention that the Federal Circuit found

12  missing in the Woodhill and Stefik references.  *PersonalWeb II*, 917 F.3d at 1382.

13      Moreover, the Federal Circuit's decisions and the Patent Office's reexamination undermine

14  the PTAB's prior decisions invalidating True Name patent claims.  For example, in the PTAB's

15  Final Written Decision invalidating claims in Patent No. 5,978,791 based on Woodhill, the PTAB

16  found that Woodhill's binary object identifiers were used to *locate and access* binary objects (the

17  alleged data items), in order to meet the recited claim limitation of "accessing a data item in the

18  system using the identifier of the data item" in claims 4, 30, and 41 of the '791 patent.[28]  But in the

19  appeal on the '310 patent, the Federal Circuit expressly disagreed:

20      • "As PersonalWeb suggests, an equally plausible, if not more plausible, understanding
            of Woodhill is that *Woodhill's system uses conventional file names and locations to*
21          *locate files and the Binary Object Offset field to locate a given binary object* within a

---

[25] Defendants refer to this comparison as "narrow" and a "plainly abstract principle under Section
101…." (Mot. at 12-13).  PersonalWeb respectfully disagrees.  Comparing a content-based
cryptographic hash identifier for any data item, regardless of size, within a computer system against
a database of identifiers for all other data items in the system to conclusively establish the data
item's content is not "abstract" and it was not conventional in 1995—especially considering that the
MD5 hash function described in both the True Name and EMC patents produces a 128 bit identifier.
But that is an issue PersonalWeb will raise on appeal.

[26] Ex. 17 (January 29, 2020 Notice of Intent to Issue Ex Parte Reexamination Certificate).

[27] *Id*. at 5.

[28] Ex. 18 (Final Written Decision in '791 IPR) at pp. 31-34, 40.

Glaser Weil

file."

- "Even if the file was not specified by the user, *Woodhill's only disclosed method of locating a current or previous file is by searching for the file using standard file block information,* including the file name and location."

- "As PersonalWeb correctly points out, *the only disclosed use of Woodhill's Binary Object Identifier is to perform a one-to-one comparison with the Binary Object Identifier* associated with the backed-up version of the binary object, *which occurs after the appropriate binary object has been located*, according to column 9."

*PersonalWeb II*, 917 F.3d at 1382 (emphasis added).

In any event, after this Court lifted the stay, PersonalWeb stipulated to summary judgment on the invalidated claims.  PersonalWeb also agreed to dismiss the asserted claims in the '442 patent after similar claims in the same patent were found invalid in a reexamination.[29]

### 5. PersonalWeb In Good Faith Opposed Defendants Patent Ineligibility Motion, Filed Almost Eight Years Into the Case

As Defendants state, PersonalWeb sought to resume the litigation after the Court lifted the stay.  (Mot. at 13).  Defendants claim that PersonalWeb acted unreasonably by not dismissing its case at Defendants' request based on their conclusion that the remaining claims "could not possibly survive scrutiny under Section 101."  (*Id.*)  But Defendants had not even included § 101 defenses in their invalidity contentions, and PersonalWeb asserted the same claims against Facebook, Google, and Apple—none of whom now seek attorneys' fees.

This Court ordered joint briefing on the § 101 issue and granted judgment on the pleadings. Defendants' summarize this Court's § 101 decision.  (Mot. at 14).  PersonalWeb has filed a Notice of Appeal, and respectfully will address its arguments on the Court's opinion in the proper appellate forum.  Suffice it to say, PersonalWeb opposed Defendants' motion in good faith, and believed it had compelling, non-trivial case law support and arguments in this still-evolving area of the law.

### C. PersonalWeb's Separate Cases Involved Claims Not Challenged or Invalidated in IPRs

Defendants point out that PersonalWeb continued to enforce the True Name patents against other defendants.  (Mot. at 14-15).  True.  But in 2012, PersonalWeb filed additional actions even

---

[29] Docket Nos. 67, 68.

Glaser Weil

before Defendants filed IPRs and all claims asserted remained unchallenged and presumptively

valid.  And even after some of the asserted claims were invalidated in IPRs, PersonalWeb still

reached settlements with most of the defendants in line with the amounts Kinetech had received

from other licensees.  Moreover, Microsoft, Yahoo, and IBM all settled after raising numerous

defenses and litigating claim construction, but without challenging any claims under § 101.

Defendants also point to actions PersonalWeb filed in January 2018 against website

operators after the patents expired.  (Mot. at 15).  But patent owners may file suit after a patent

expires so long as damages are available within the six-year statutory window.  *See* 35 U.S.C. § 286.

Further, PersonalWeb only asserted still-valid patent claims in those actions.  Thus, Defendants'

assertion that PersonalWeb litigated "defective" claims in these actions is wrong and unsupported.

## III.    LEGAL STANDARDS

A "court in exceptional cases may award reasonable attorney's fees to the prevailing party."

35 U.S.C. § 285.  An "'exceptional case' is simply one that stands out from others with respect to

the [1] substantive strength of party's litigating position (considering both governing law and facts

of case) or [2] unreasonable manner in which case was litigated."  *Octane*, 572 U.S. at 554.  "[A]

case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set

itself apart from mine-run cases to warrant a fee award," *id*. at 555, as determined on a "case-by-

case" and "considering the totality of the circumstances."  *Id*. at 554.  In making the determination,

courts may consider factors such as "frivolousness, motivation, objective unreasonableness (both in

the factual and legal components of the case) and the need in particular circumstances to advance

considerations of compensation and deterrence." *Id*. at 554 n.6 (citation omitted).

But "[a]s the Supreme Court has stressed, the fee-shifting statute that was the precursor to §

285 did not contemplate the award of fees 'as a penalty for failure to win a patent infringement

suit.'"  *Opticurrent, LLC v. Power Integrations, Inc.*, No. 17-CV-03597-EMC, 2019 WL 2389150,

at *25 (N.D. Cal. June 5, 2019) (quoting *Octane*, § 572 U.S. at 548–49).  Rather, courts under the

prior statute (§ 70) "viewed the award of fees … as appropriate 'only in extraordinary

circumstances' enabling them 'to address unfairness or bad faith in the conduct of the losing party,

or some other equitable consideration of similar force,' which made a case so unusual as to warrant

16

fee-shifting." *Octane*, 572 U.S. at 548-49 (quoting *Park–In–Theatres, Inc. v. Perkins*, 190 F.2d 137, 142 (9th Cir. 1951)). "[I]n interpreting the damages provision of the Patent Act, [] the addition of the phrase 'exceptional cases' to § 285 was 'for purposes of clarification only.'" *Id*. at 549 (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 653, n.8 (1983)). As such, "application of the American Rule remains the well-established presumption even in patent cases" just as it did under § 285's precursor. *EON Corp.IP Holdings LLC v. Cisco Sys. Inc*, No. 12–cv–01011–JST, 2014 WL 3726170, at *5 (N.D. Cal. July 25, 2014). "[M]erely taking an aggressive stance while positing stretched or unsuccessful infringement theories does not, without more, warrant fee-shifting." *Vasudevan Software, Inc. v. Microstrategy, Inc.*, No. 11-cv-06637 RS, 2015 WL 4940635, at *5 (N.D. Cal. Aug. 19, 2015) (citing *TransPerfect Global, Inc. v. MotionPoint Corp.*, No. 10-cv-02590 CW, 2014 WL 6068384, at *8 (N.D. Cal. Nov. 13, 2014) ); *Kreative Power, LLC v. Monoprice, Inc.*, No. 14-cv-02991 SI, 2015 WL 1967289, at *5 (N.D. Cal. Apr. 30, 2015)).

## IV.    ARGUMENT

Defendants argue that courts in this circuit have awarded fees in patent cases "with facts similar to those presented here." (Mot. at 16). Not so. The cases Defendants cite have entirely dissimilar facts that bespeak meritless cases or subjective bad faith. In contrast, courts in this circuit have rejected fee awards in patent cases, albeit hard-fought, under the circumstances present here.

### A.    Personalweb's Patent Infringement Claims Against Defendants Were Not "Exceptionally Meritless"

Defendants assert that fees should be awarded because PersonalWeb's patent claims were "exceptionally weak on the merits" and Defendants gave PersonalWeb "clear notice" of its views. (Mot. at 19-22). Telling an opposing party that it will not prevail is something that both sides do in every case, and usually a court or jury will agree with one side or the other. Thus, PersonalWeb's pursuit of its claims despite Defendants' "clear notices" do not make this case "exceptional."

"[I]t is the 'substantive strength of the party's litigating position that is relevant to an exceptional case determination, not the correctness or eventual success of that position. A party's position on issues of law ultimately need not be correct for them to not 'stand[ ] out,' or be found reasonable." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) (citing *Octane*,

17

1825656

1   572 U.S. at 554).  Courts look for objective baselessness or frivolousness, not whether a patent

2   originally allowed by a patent examiner was later invalidated.  *Hockeyline, Inc. v. STATS LLC*, No.

3   13-CV-1446 (CM), 2017 WL 1743022, at *3 (S.D.N.Y. Apr. 27, 2017); *Location Based Servs., LLC*

4   *v. Niantic, Inc.*, No. 17-CV-04413 NC, 2018 WL 7569160, at *2 (N.D. Cal. Feb. 16, 2018) (denying

5   fees where the court did "not find that [the patentee's] position was *clearly untenable* or that it

6   *provided no evidence* in support of its position.") (emphasis added).  An objectively baseless or

7   frivolous patent case is one "that no reasonable litigant could reasonably expect success on the

8   merits." *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1327 (Fed. Cir. 2013).  Courts

9   have found such objective baselessness when, for example, a plaintiff fails to conduct a proper

10  prefiling investigation of its infringement claims or refuses to dismiss after receiving conclusive

11  evidence of noninfringement in code or schematics.  *See Yufa v. TSI Inc.*, No. 09-cv-1315-KAW,

12  2014 WL 4071902, at *3-5, 8 (N.D. Cal. Aug. 14, 2014).

13       As to the merits, Defendants cite the fact that (1) some but not all asserted claims were

14  invalidated in the IPR process, (2) PersonalWeb voluntarily dismissed asserted claims in the '442

15  patent based on results in a reexamination proceeding challenging different claims, and (3) claims

16  that the Federal Circuit twice considered and both times reversed the PTAB's invalidity findings

17  were later found ineligibly abstract under Section 101.  (Mot. at 19).  None of these circumstances

18  reveal that PersonalWeb's claims were exceptionally meritless.

19       As to the IPRs, the fact that Defendants decided against challenging the validity of all

20  asserted claims in all patents demonstrates their belief that some asserted claims would not be

21  invalidated—a belief that proved true as to asserted '310 patent claims in two Federal Circuit

22  decisions.  In fact, the Federal Circuit's description of how the prior art compares to the '310 patent

23  claims outright conflicts with the PTAB's explanation of why the same prior art invalidated other

24  True Name claims.  *See supra*, at 14-15.  Moreover, Defendants' decision to hedge their IPR

25  positions by not including the asserted '310 patent claims, together with the two Federal Circuit

26  decisions, disprove Defendants' false characterization of the True Name invention scope as nothing

27  more than the "use of 'content-based identifiers' for data items in a computer system," which lack

28  novelty.  (Mot. at 19-20).  Finally, Defendants' attack on the strength of the True Name patents—

strength demonstrated over a fifteen year period in dozens of licenses—fails to consider that EMC itself owns 13 patents with hundreds of claims covering essentially the same invention recited in the True Name patents, but with later priority dates.

Nor does the fact that PersonalWeb voluntarily dismissed claims from the '442 patent based on a reexamination decision invalidating different, non-asserted claims in the same patent suggest that PersonalWeb's case was frivolous from the outset. To the contrary, the Patent Office's recent reexamination decision affirming the validity of the asserted '310 patent claims demonstrates the objective merits of PersonalWeb's case.

As to the § 101 decision, the facts, law, and briefing in this changing area of law reveal no exceptional baselessness in PersonalWeb's position. Most certainly, Defendants did not omit the asserted claims in the '310 patent from its IPRs because they intended to challenge those claims under § 101 and believed they would prevail. Indeed, Defendants did not even assert § 101 in their invalidity contentions and then waited nearly eight years to raise a § 101 defense as to those claims. Ultimately, the Federal Circuit will decide whether the asserted True Name claims—calculating a cryptographic hash for all data items in a computer network to create unique, content-based identifiers, comparing an identifier against the other stored identifiers in the system, and using the results to, among other things, locate and retrieve a particular data item—is an abstract idea or a novel, more efficient way of handling data. Regardless of the outcome, PersonalWeb's position was not exceptionally meritless.

Defendants cite no authority for awarding attorneys' fees based on adverse IPR decisions where a defendant decided against challenging some asserted claims in the IPRs—particularly when the Federal Circuit later affirmed the validity of those claims. Instead, Defendants rely on entirely dissimilar cases with almost no facts in common to the facts here. First, Defendants cite *Munchkin*—a decision argued in February at the Federal Circuit that remains undecided. In *Munchkin*, the defendant, LNC, filed IPRs on *all* asserted claims (unlike here) based on prior art not cited during prosecution, and the PTAB invalidated *all* claims, which the Federal Circuit affirmed— leaving no valid claims. *Munchkin, Inc. v. Luv N' Care, Ltd.*, No. CV 13-06787 JEM, 2018 WL 7504404 at *2 (C.D. Cal. Dec. 27, 2018). Then, recognizing the weakness of its "spill proof

container" patent, the plaintiff "sought a voluntary dismissal under Rule 41(a)(2) in an attempt to avoid a final judgment that would establish LNC as the prevailing party." 2018 WL 7504404 at *6. Second, Defendants cite *Logic Devices*, a case in which Apple obtained summary judgment of invalidity based on obviousness-type double patenting. *Logic Devices, Inc. v. Apple Inc.*, No. C 13-02943 WHA, 2014 WL 6844821 at *3 (N.D. Cal. Dec. 4, 2014). Without conducting a pre-filing investigation, plaintiff's counsel first asserted that a terminal disclaimer had been filed that precluded double patenting invalidation, but later, at the summary judgment hearing, admitted that no terminal disclaimer existed. 2014 WL 6844821 at *4. In contrast to these cases, courts have declined to find a party's litigating position "exceptionally meritless" just because it did not prevail in IPRs. *Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d 1175, 1177 (Fed. Cir. 2018) (declining  finding that a patentee's reliance on the presumption of validity "not necessarily unreasonable" despite adverse IPR decisions); *Hockeyline*, 2017 WL 1743022 at *2-3 ("Although [the] PTAB and the Federal Circuit ultimately … determined the claims at issue to be unpatentable … Hockeyline's arguments are not frivolous; they are supported by the patent specification and other unchallenged claims….").

In arguing that an adverse § 101 decision alone can alone warrant an exceptional case finding, Defendants cite *My Health*. (Mot. at 21-22). Unlike here, the *My Health* patent claimed "[p]atient treatment and monitoring methods," and, in over 30 prior cases, the patentee repeatedly avoided testing the merits for either validity in IPRs or patent eligibility under § 101 by dismissing cases or accepting "nuisance" value settlements after IPRs and § 101 motions were filed. *My Health, Inc. v. ALR Techs., Inc.*, No. 216-cv-00535-RWS-RSP, 2017 WL 6512221, at *4 (E.D. Tex. Dec. 19, 2017). In eventually holding the claims patent ineligible, the court found that such monitoring claims had "universally been found to be unpatentable under *Alice*." *Id*. In contrast, courts have declined to award fees after an adverse § 101 decision in cases were the patentee's arguments were not "clearly untenable" and contained opposition … support for its position"— further recognizing that "[t]he law under § 101 is developing and quickly changing, and the question of whether a patent is directed at an abstract idea or whether it discloses an innovative concept is not easy to answer." *Location Based Servs.*, 2018 WL 7569160 at *2. *See also CertusView Techs.,*

20

1825656

1    *LLC v. S & N Locating Servs., LLC*, 287 F. Supp. 3d 580, 582 (E.D. Va. 2018) ("S & N's decision to

2    answer the complaint, file counterclaims, and engage in discovery and claim construction before

3    filing its motion for judgment of patent-ineligibility—five months after CertusView filed its suit—

4    undercuts the strength of its argument that it was objectively unreasonable for CertusView to assert

5    the patents…."); *Baggage Airline Guest Servs., Inc. v. Roadie, Inc.*, No. CV 18-707-RGA, 2020 WL

6    757891, at *2 (D. Del. Feb. 14, 2020) ("Although I ultimately found the claims of the '336 patent to

7    be directed to the abstract idea of coordinating and monitoring baggage delivery, and containing no

8    inventive concept, the case was not 'exceptionally meritless.'").

9        Finally, the fact that the Patent Office issued a reexamination certificate for the '310 patent

10   this year, well after *Alice*, without raising § 101 as an issue, demonstrates that PersonalWeb's

11   reliance on the patent's presumption of validity, including patent eligibility, was reasonable.  *See*

12   *Garfum.com Corp. v. Reflections by Ruth*, No. CV 14-5919-JBS-KMW, 2016 WL 7325467, at *4

13   (D.N.J. Dec. 16, 2016).

14       **B.**    <u>**Personalweb Did Not Engage In "Exceptionally Unreasonable" Litigation**</u>

15                  <u>**Conduct Or Pursue Its Claims In Subjective Bad Faith**</u>

16       In considering attorneys' fee requests under *Octane*, courts look for "subjective bad faith."

17   *Adaptix, Inc. v. Apple, Inc.*, No. 5:13-CV-01776-PSG, 2015 WL 5158716, at *1 (N.D. Cal. Sept. 2,

18   2015).  Cases awarding fees based on litigation misconduct generally are "shenanigan-filled" such

19   that they stand out from the rest.  *Location Based Servs.*, 2018 WL 7569160, at *3 (citing *Logic*

20   *Devices*, 2014 WL 6844821 at *4)).

21       Defendants assert that PersonalWeb engaged in exceptionally unreasonable litigation

22   conduct, and used "improper" litigation tactics."  (Mot. at 17-19).  In support, Defendants claim that

23   PersonalWeb "maximized" their defense costs, and cite eight "events" that supposedly reflect bad

24   faith.  (Mot. at 17-18).  PersonalWeb did nothing of the sort:  Its litigation conduct remained

25   professional and reasonable at all times, consistent with its counsel's duty of zealous representation.

26   *See* N.D. Cal Guidelines for Professional Conduct.

27       *First*, Defendants point to PersonalWeb's alleged illegitimate formation in Texas and its

28   development of a "fictional" StudyPods application.  These assertions are untrue, and Defendants

1825656

1    are well aware, the EDTX Court already rejected them, finding that "PersonalWeb is a legitimate

2    company operating a legitimate business in East Texas."  *Supra* n.12.

3         *Second*, Defendants point to PersonalWeb employees' deletion of emails two months before

4    filing suit.  PersonalWeb was sanctioned for this in a separate case (in which the defendants have

5    not sought fees), and paid the sanction.  Further, Defendants never raised this issue during the

6    litigation and cannot point to a single deleted email relevant to PersonalWeb's claims.

7         *Third*, Defendants cite PersonalWeb's non-joinder of Level 3 at the outset.  But Level 3 had

8    never been joined in prior actions and Defendants jumped the gun on their motion.  Had they first

9    sought a resolution, PersonalWeb could have obtained Level 3's cooperation—just as it did—

10   without requiring further briefing or resolution by the Court.

11        *Fourth*, Defendants rehash their transfer motion, citing BDE's prior suits in California and

12   opposition to transfer.  But the EDTX Court denied most of the transfer motions, found efficiencies

13   in litigating all claim construction issues in Texas, and flatly rejected the same argument regarding

14   BDE as "flawed"—a finding that Defendants mention nowhere.  *Supra* at 10, n.18.

15        *Fifth*, Defendants assert that PersonalWeb refused to "consent" to a stay pending a decision

16   on the IPRs.  But Defendants waited eight months from filing IPRs and three months from

17   institution to even seek a stay.  Further, Defendants intentionally hedged their IPRs by leaving some

18   asserted claims for resolution before this Court—thus guaranteeing validity litigation in two forums.

19   Moreover, Defendants point to no substantial litigation expenses between the briefing on their

20   motion to stay and the decision staying the case because PersonalWeb undertook no costly actions

21   during this period.  And scarce law existed at the time on stays pending IPRs.  Finally, once the

22   Court entered the stay, PersonalWeb agreed to extend it pending the outcome of any IPRs by any

23   party affecting challenged claims.

24        *Sixth*, Defendants point to evidentiary objections that PersonalWeb filed in the IPRs as it was

25   permitted to do.  Defendants lack any evidence that the objections hindered or delayed the IPRs in

26   any way, and if the PTAB actually found the objections sanctionable, it could have awarded fees.

27   But Defendants did not seek fees in the IPRs and the PTAB did not award them.

28        *Seventh*, Defendants raise the fact that PersonalWeb opposed a discovery stay pending

PERSONALWEB'S OPPOSITION TO DEFENDANTS'' ATTORNEYS' FEE MOTION

1825656

Glaser Weil

"resolution" of their "meritorious" § 101 motion.  Of course, PersonalWeb sought to resume

discovery before Defendants had filed their § 101 motion, and did not know at the time their motion

would be granted.  And this Court already had issued a discovery and pretrial schedule in the

Facebook case.  In any event, no discovery actually took place before the Court stayed the case for

the § 101 motion.

*Eighth*, Defendants raise the separate MDL proceedings.  But Defendants fail to explain how

those separate matters affected Defendants or this case in any way—and it did not.

Defendants compare their eight alleged instances of bad faith litigation (which is nothing of

the sort) to conduct in four cases that warranted fee awards.  In *Munchkin*, the alleged exceptional

litigation misconduct included not just "unnecessary motion practice," (Mot. at 18), but continuing

"all out litigation" in the face of IPRs on all claims and attempting to avoid final judgment after all

claims were invalidated by seeking dismissal under Fed. R. Civ. P. 41(a)(2).  *Munchkin*, 2018 WL

7504404, at *2 (on appeal).  In *Reedhycalog*, the court found bad faith based on, among other

things, concealing "relevant and discoverable but damaging documents" and filing meritless

motions to reconsider.  *ReedHycalog UK, Ltd. v. Diamond Innovations Inc.*, No. 6:08-cv-325, 2010

WL 3238312, at *6-7 (E.D. Tex. Aug. 12, 2010).  In *Large Audience Display Sys., LLC v. Tennman

Prods.*, LLC, 745 F. App'x 153, 154-155 (Fed. Cir. 2018), the plaintiff was formed in Texas "only

two days prior to the filing of this lawsuit," "had never conducted any business in Texas—indeed,

had never even picked up the keys to the office—and had failed to pay its corporate taxes for three

years, which lead to a suspension of its corporate form."  That, combined with plaintiff's use of a

privileged email and a claim construction position that conflicted with the file history, were enough

to uphold a fee award.  Finally, in *My Health*, the court found subjective bad faith based not just on

the number of prior litigations, but because plaintiff had "no intention of testing the merits" of its

patient treatment and monitoring methods, which claim type had "universally been found to be

unpatentable under Alice."  The court also found "troubling" plaintiff's false statement in moving to

dismiss its appeal.  *My Health*, 2017 WL 6512221, at *4-6.

These cases share nothing in common with PersonalWeb and demonstrates that this case is

not close to exceptional..  PersonalWeb repeatedly sought to test the merits of its case, including in

1825656

Glaser Weil

Federal Circuit appeals.  Its computer networking patent claims are of the type most challenging to apply under the *Alice* framework.  It formed in Texas and began product development well before acquiring the True Name patents.  It had employees and paid taxes.  And it never used privileged documents.  Filing multiple cases over a number of years, even against the same defendants, does not suggest bad faith or "warrant an award of fees." *Adaptix*, 2015 WL 5158716, at *4.  Indeed, Defendants present no evidence that PersonalWeb ever sough "to force nuisance settlements."  It instead "litigated its position on the merits …, presenting claim construction arguments before the District Court and responses to the IPR petition[s] before the PTAB," thus demonstrating good faith. *See Stone Basket Innovations, LLC v. Cook Med. LLC*, 892 F.3d at 1184.  Likewise, PersonalWeb's decision to continue the case after receiving Defendants letters threatening a fee motion does not make a case exceptional because PersonalWeb did not advance "frivolous or objectively baseless arguments." *Hockeyline*, 2017 WL 1743022, at *5.  In sum, none of Defendants' cited "conduct"—some of which is false or exaggerated—comes close to the type of exceptional litigation misconduct that has justified fee awards.

On the other hand, Defendants' misrepresentations of fact in this motion—citing as fact false assertions without telling this Court that the EDTX Court had already considered and rejected them, shows unclean hands that alone can warrant denial of attorneys' fees. *See Intellectual Ventures II LLC v. FedEx Corp.*, No. 2:16-CV-00980-JRG2019, 2019 U.S. Dist. LEXIS 169673 at *20 (E.D. Tex. Mar. 28, 2019).

**C.   This Court Should Not Award Fees for IPR Proceedings Even if Fees Are Otherwise Awarded**

In the event the Court finds this case exceptional, PersonalWeb submits that it would not be appropriate to award fees in connection with the IPR proceedings.  While some courts have awarded fees expended in IPR proceedings, others have not.  *See Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 315 F. Supp. 3d 977, 1019–20 (N.D. Ill. 2018), *aff'd in part, vacated in part, rev'd in part sub nom. Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019).  Generally, courts have included IPR proceedings in fee awards only when ""[t]he parties and the district court clearly intended to replace the district court litigation with the [Patent Office] proceedings." *PPG*

*Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1568 (Fed. Cir. 1988).  That is not the case here.  Defendants intentionally omitted patents and claims from the IPR proceedings.  Accordingly, Defendants did not seek to entirely replace the court's determination of validity issues in this case with the IPRs.  Regardless of the IPR outcomes, it was always the case that the court would need to address the remaining claims and consider mostly the same issues and arguments raised in the IPRs.  This necessary duplication of proceedings, created by design, should not be rewarded with attorneys' fees even if this case were deemed exceptional under § 285 and *Octane*, which it is not.

Finally, after Defendants' delay in bringing IPRs and the six-year IPR process, claims still remained in this Court.  If this Court were to find PersonalWeb's litigating position on the § 101 issue exceptionally meritless at that point, then fees should be limited only to Defendants' share of the § 101 motion.

## V.      CONCLUSION

Although PersonalWeb did not prevail before this Court, a § 285 attorney fee award is not intended to be a penalty for failure to win a patent infringement case.  PersonalWeb's patent infringement claims against Defendants were not "exceptionally meritless." Nor did PersonalWeb engage in "exceptionally unreasonable" litigation conduct or pursue its claims in subjective bad faith.  Accordingly, PersonalWeb respectfully asks that Defendants' motion for attorneys' fees under 3 U.S.C. § 285 be denied.  If the Court finds that fees should be awarded for any aspect of the case, given the fact that the asserted claims of the '310 patent remained valid after the IPRs, the fees should be limited to Defendants' share of the § 101 motion.

DATED:  April 22, 2020

GLASER WEIL FINK HOWARD
   AVCHEN & SHAPIRO LLP


By:   */s/ Lawrence M. Hadley*
      LAWRENCE M. HADLEY
      STEPHEN E. UNDERWOOD
      Attorneys for Plaintiff
      PERSONAL WEB TECHNOLOGIES, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Civil L.R. 5-1(h)(1) on April 22, 2020.

Dated: April 22, 2020

By:   */s/ Lawrence M. Hadley*
Lawrence Hadley

1825656